FILED
JAMES BONINI
CLERK

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

2007 FEB 15 ⊓ 4: 25

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

**INHALATION PLASTICS, INC.**

Plaintiff,

v.

**MEDEX CARDIO-PULMONARY, INC.,**

Defendant.

Case No. **2 : 0 7 CV 1 6**

JUDGE SMITH

Judge _____

Magistrate Judge MAGISTRATE JUDGE KING

## COMPLAINT

Plaintiff, Inhalation Plastics, Inc. ("Inhalation Plastics"), complaining of Medex Cardio-Pulmonary, Inc. ("Medex CP"), states and alleges as follows:

### The Parties

1.     Inhalation Plastics is an Illinois corporation that has its principal place of business in Chicago, Illinois.

2.     Inhalation Plastics was for many years (and until May 10, 2002) a manufacturer and distributor of medical products used in the treatment of patients having respiratory and anesthesia needs. Inhalation Plastics manufactured its products in Chicago, Illinois and sold them throughout the world. The company is and was owned by Walter Levine, its president, and at all relevant times Inhalation Plastics operated its business from a plant located in Chicago, Illinois, which plant was owned by Merrimac Trust, of which Mr. Levine was the principal beneficiary. Collectively, these parties are referred to hereinafter as "IPI."

3.     Medex, Inc. and Medex CP are both Ohio corporations that have their principal places of business in Carlsbad, California. Medex CP is a respiratory device operating division that Medex,

1

Inc. created to acquire (on behalf of Medex, Inc.) IPI and its business, *vis-a-vis* the acquisition of IPI's assets and through the leasing of the machinery and equipment used in connection with the IPI business. Collectively these parties are referred to hereinafter as "Medex."

4.      Medex was at all relevant times a manufacturer and distributor of medical products. After Medex acquired IPI and its business, it manufactured the IPI lines of products in Illinois, Ohio and Mexico, and distributed those products throughout the world.

## Venue and Jurisdiction

5.      Jurisdiction in this Court is proper pursuant to 28 U.S.C. §1332, in that the amount in controversy exceeds $75,000, exclusive of interest and costs, and in that there is diversity of citizenship between the parties.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(1), in that the defendant resides in this judicial district.

## Factual Allegations Common to All Counts

7.      On or about May 10, 2002, IPI entered into a series of related agreements with Medex, the purposes of which were for Medex to acquire IPI and its business in exchange for certain payments and other consideration. Pursuant to these agreements, Medex leased from Merrimac Trust certain real property located at 3217 North Kilpatrick Avenue in Chicago, Illinois at which all of IPI's business operations were located; Medex leased from IPI the machinery and equipment utilized by IPI in the manufacture and distribution of all of the medical products IPI made and sold in its business operations; and Medex purchased from IPI all or substantially all of IPI's other assets. Part of the consideration flowing to IPI under these agreements was the obligation of Medex to make certain continuing payments to IPI ("additional rents"), based upon how the IPI business performed

2

under Medex. This was an important component of the consideration flowing to IPI, as Medex did not previously manufacture and sell product lines competing with those of IPI, and IPI had an expectancy of earning substantial additional monies (potentially, and projected to be, many millions of dollars) based upon the revenue and profit generation of the IPI product lines under Medex.

8.    Thereafter, Medex began occupying the real property located at 3217 North Kilpatrick in Chicago, Illinois, assumed possession of IPI's raw materials, inventory, molds, dies, tooling, machinery, equipment, and intellectual property, all of which were used in the manufacture and distribution of the IPI product lines. Medex then hired IPI's employees. It then began operating the business that IPI had operated until the parties entered their agreements on or about May 10, 2002, all as was agreed upon by the parties.

9.    Thereafter, various disputes developed between IPI and Medex, including various disputes over whether Medex was fulfilling its obligations under the parties' agreements, and whether it was providing IPI with the full measure of consideration it had agreed to provide IPI.

10.    In or about December 2004, Medvest Holdings Corporation, the company that owned Medex, entered into an agreement to merge with a wholly owned subsidiary of Smiths Medical Holdco Limited (hereinafter "Smiths Holdco"), and to thus become a wholly owned subsidiary of Smiths Holdco. Smiths Holdco also owned various other entities, including Smiths Group PLC, which in turn owned Smiths Medical ASD, a business unit that manufactured and sold medical devices, some of which directly competed with the IPI product lines. Thereafter, Medex gradually ceased its operation of the IPI business, gradually ceased manufacturing and distributing the IPI product lines, and improperly assigned and transferred to Smiths Medical ASD all of its rights, duties, obligations and interests in and under its agreements with IPI, and in and to all of the assets

3

that it purchased and all of the machinery and equipment that it leased from IPI.

11.    Medex's Assignment and transfer to Smiths Medical ASD of all of its rights, duties, obligations and interests in and under its agreements with IPI, and in and to all of the assets that it purchased and all of the machinery and equipment that it leased from IPI, was improper and in violation of the terms of the agreements between IPI and Medex. It violated Section 8.5 of the Asset Purchase Agreement that the parties entered, and it violated Paragraph 21 of the Machinery And Equipment Production Lease that the parties entered. One reason such assignments were forbidden was because IPI stood to gain financially by sales of its product lines. Medex did not have competing product lines and thus had an incentive to fully market the IPI product lines, whereas other companies, such as Smiths Medical ASD (to whom Medex made the improper assignment), already marketed competing product lines and did not have the same incentive to fully market the IPI product lines. Such an assignment was likely to negatively impact the consideration that IPI ultimately would receive under the agreements with Medex.

12.    Medex no longer operates the business that it acquired from IPI, no longer possesses the assets of IPI that it purchased, no longer possesses the machinery and equipment that it leased from IPI, and has assigned and transferred to Smiths Medical ASD all of the rights, duties, obligations and interests it had in and under its agreements with IPI, and in and to all of the assets that it purchased and all of the machinery and equipment that it leased from IPI. Medex has effectively substituted Smiths Medical ASD in the stead of Medex.

13.    Medex even assigned IPI's FDA facility registration (#1417519) to Smiths Medical ASD, and did so without IPI's approval.

14.    Medex also assigned IPI's device listings for all of the IPI devices to Smiths Medical

4

ASD, again without IPI's approval.

15.     When IPI objected to Medex's improper assignment and advised Medex that it

considered filing suit against Medex based on its breaches of its contracts, Smiths, who was not a

party to the IPI contracts, objected to IPI's selection of a law firm to represent IPI, ostensibly on

grounds that the law firm had a conflict of interests, which Smiths would not waive. The law firm

did not then represent Medex, and had never represented Medex, but instead had represented Smiths

Medical ASD.

16.     In breach of its agreements with IPI, Medex has allowed Smiths Medical ASD to

assume the position of Medex with respect to the IPI contracts.

## COUNT I - BREACH OF WRITTEN CONTRACT

17.     For its allegations in paragraph 17, IPI incorporates by reference its allegations in

paragraphs 1through 16 above, as if those allegations were fully set forth herein.

18.     On or about May 10, 2002, IPI entered into a series of interrelated written contracts

with Medex. Among the agreements were an Asset Purchase Agreement and a Machinery And

Equipment Production Lease. Pursuant to each of these agreements, Medex expressly agreed that it

would not assign or transfer its rights, duties, obligations, or scheduled assets, including machinery

and equipment, to anyone without the prior written consent of IPI.

19.     Pursuant to Article I of the Asset Purchase Agreement, IPI sold and leased to Medex

all of the assets related to IPI's business on the terms and conditions described in the agreement.

Pursuant to Section 8.5 of the Asset Purchase Agreement, Medex expressly agreed that "[n]either

this Agreement nor any rights or obligations under it are assignable."

20.     Pursuant to paragraph 21 of the Machinery And Equipment Production Lease, Medex

5

also agreed that "[w]ithout [IPI's] prior written consent, [Medex] shall not assign this Agreement or any schedule or assign its rights in or sublet the equipment or any interest therein . . ." As described above, this provision was important to IPI because it related directly to the amount of consideration that IPI would ultimately receive under the Machinery And Equipment Production Lease, which was tied to revenues and profits earned by Medex based upon sales of products in the IPI product lines. As described above, Medex did not manufacture or sell any products that competed with the IPI product lines. Other manufacturers of medical devices did, and IPI did not want an assignment made to a competitor, as that would diminish the consideration that IPI was likely to receive under its agreement.

21.    Medex breached its obligations under the Asset Purchase Agreement and under the Machinery And Equipment Production Lease by assigning and transferring to Smiths Medical ASD all of its rights, duties, obligations and interests in and under its agreements with IPI, together with all of the scheduled assets, including the machinery and equipment that IPI sold and leased to Medex. Smiths Medical ASD was and is a medical device manufacturer that sold and sells product lines that directly compete with some of the IPI product lines. IPI never consented to the assignment and transfer made to Smiths Medical ASD. IPI demanded that its agreements with Medex and the rights, obligations, duties, schedules, and machinery and equipment not be assigned, transferred, or otherwise assumed by Smiths Medical ASD. Medex refused to comply with IPI's demands.

22.    Pursuant to the Machinery And Equipment Production Lease, Medex also agreed, among other things, to "use the Equipment lawfully and exclusively in connection with [Medex CP's] business operations" and that "without [IPI's] prior written consent . . . [it would] not move the Equipment from the Equipment location." Pursuant to Sections 11 and 14 of the Machinery And

6

Equipment Production Lease, Medex agreed to keep in good repair, condition and working order all of the machinery and equipment that it leased from IPI, and agreed to assume the risk of loss of any or all of the machinery and equipment subject to the lease. In breach of its obligations under and pursuant to the Machinery And Equipment Production Lease, Medex has irretrievably lost certain pieces of the machinery and equipment subject to the lease. Medex also breached its obligations under the Machinery And Equipment Production Lease by moving numerous pieces of the leased machinery and equipment from the equipment location to locations operated by Smiths Medical ASD, all without the consent of IPI. Medex even refused to tell IPI where it had moved IPI's machinery and equipment when IPI requested this information.

23.     Pursuant to Section 2.1.3 of the Asset Purchase Agreement, Medex also was required to provide IPI with monthly reports of sales and with quarterly financial statements. It was required to allow IPI to review, examine, and audit books and records of Medex in which Medex maintained information related to payments that might be due IPI under the Machinery And Equipment Production Lease, together with documents necessary to substantiate the entries made in those books and records.

24.     Medex failed to provide IPI with monthly reports of product sales, failed to provide IPI with quarterly financial statements, and refused to allow IPI to review Medex's records relating to financial and product costing information, all of which Medex was required to provide to IPI under Section 2.1.3 of the Asset Purchase Agreement.

25.     IPI made numerous demands for the above information throughout 2005 and 2006, orally and in writing. Medex provided only some of the information that was requested, and still to date has not provided the majority of the requested financial and related information, all of which IPI

7

needs in order to assess sales and earnings figures from which any amounts that are due or to become due to IPI under the Machinery And Equipment Production Lease can be determined. Medex also recently failed to pay IPI $2,000 in rent due IPI under Section 5(a) of the Machinery And Equipment Production Lease, in breach of its agreement with IPI.

26. The limited financial information that has been made available either publicly or to IPI has been falsely or inaccurately reported. Medex and Smiths Medical ASD have acknowledged this through public statements by existing Smiths employees, former Smiths employees and former Medex employees, all of whom are or were in positions of responsibility and knowledge within the direct functional area that would have access to the financial information. Medex, and Smiths Medical ASD have reported financial results, and have made certain sales and revenue projections and forecasts that call into doubt whether Medex and Smiths Medical ASD have reported accurate financial information, both outside of the companies and internally. The financial projections and forecasts prepared by Medex and Smiths Medical ASD, if accurate, should lead to significant payments to IPI of "additional rents" under the Machinery And Equipment Production Lease. Nevertheless, Medex and Smiths Medical ASD have not made any payments of the "additional rents" that they would be required to pay IPI under the Machinery And Equipment Production Lease. The information that Medex and Smiths Medical ASD have reported in public filings has differed dramatically from what they each have reported to IPI, and from what they each have reported, forecasted, and projected internally.

27. Additionally, from what information is available, it appears that Smiths Medical ASD is allocating operating expenses and costs improperly, and that this is or may be impacting whether IPI would be owed "additional rents" under the Machinery And Equipment Production Lease. Ed

8

Yoxin, Vice President of Business Medical for Smiths Medical ASD, admitted this in an e-mail.

28.     The failure and refusal of Medex to provide IPI with the timely and accurate financial and related information called for by contract and requested by IPI constitutes a material breach of the Asset Purchase Agreement.

29.     IPI will not be able to determine accurately what, if any, monies may be owed to IPI under and pursuant to the Machinery And Equipment Production Lease unless and until Medex is ordered to provide IPI with all of the information that it is required to provide IPI, and until it has performed an accounting.

30.     Medex has materially breached various obligations as described above under and pursuant to the Asset Purchase Agreement and the Machinery And Equipment Production Lease.

31.     IPI has performed all of its obligations under and pursuant to its agreements with Medex.

32.     As a direct and proximate result of Medex's breaches of its agreements, as described above, IPI has been and will continue to be damaged.

## COUNT II - BREACH OF ORAL CONTRACT

33.     For its allegations in paragraph 33, IPI incorporates by reference its allegations in paragraphs 1 through 16 above, as if those allegations were fully set forth herein.

34.     In or about March of 2005, Medex completed a merger with and became a part of Smiths Holdco. Thereafter, Medex assigned and transferred to Smiths Medical ASD, which was owned by Smiths Holdco, all of its rights, duties, obligations and interests in and under its agreements with IPI, together with all of the scheduled assets that IPI sold to Medex, and all of the machinery and equipment that IPI leased to Medex. Medex then advised Walter Levine, IPI's

9

President, that Smiths Medical ASD would be taking control of the IPI business that Medex had purchased, and that Mr. Levine would thereafter become an employee of and begin reporting to Smiths Medical ASD.

35.    IPI advised Medex that Medex was in breach of its obligations under it agreements with IPI because it had improperly assigned and transferred its contracts with IPI and all of its rights, duties, obligations, and interests thereunder to Smiths Medical ASD, and because Mr. Levine, by contract, was an employee of Medex, not Smiths Medical ASD, and by contract was bound to report only to the CEO or COO of Medex. Mr. Levine advised Medex that IPI contemplated bringing suit against Medex for its breaches of the parties' agreements, and that it contemplated seeking as relief in that suit the termination of the parties' agreements and taking back the IPI business, which relief was provided for in the parties' agreements.

36.    Additionally, because Medex also improperly assigned Mr. Levine's employment contract to Smiths Medical ASD, Mr. Levine also advised Medex that he intended to resign his employment under the qualified resignation provisions of his employment contract, and that he intended to seek the relief provided for in his employment agreement for qualified resignations.

37.    Dominick Arena, Medex's President, implored Mr. Levine not to resign, and asked Mr. Levine to refrain from filing suit on behalf of IPI and against Medex and to not "make waves" with regard to the assignment. Mr. Arena stated that Medex had a lot at stake, as Smiths Holdco held back a substantial portion of the merger consideration, pending resolution of any and all potential and contingent liabilities that Medex might have to others.

38.    When Mr. Levine nonetheless objected in the summer and fall of 2005 to the assignment and transfer to Smiths Medical ASD of Medex's rights, duties, obligations, and interests

10

under the contracts, and advised Medex that he planned to resign, Dominick Arena, who was the president of both Medex and Smiths Medical ASD following the merger, orally offered that Medex would pay IPI, within the year, and prior to the time that he planned to step down as president of the companies, an amount of not less than $7,000,000, in exchange for IPI's agreement to refrain from interfering with the Medex-Smiths arrangement, and in exchange for Mr. Levine agreeing not to resign. In particular, Mr. Arena stated in October of 2005 that he would work with Smiths Medical ASD to get between $7,000,000 and $10,000,000 to buy out IPI, and stated that if Smiths Medical ASD would not come up with the money, Medex would pay the money.

39.    What Mr. Arena asked of Mr. Levine and IPI had significant value to Medex because Smiths Holdco held back a significant portion of the acquisition price it agreed to pay Medvest (the holding company that owned Medex), in order to address contingent liabilities that Medex might have to others, such as to IPI or Mr. Levine. If IPI had pursued the issues it raised in regard to Medex's assignment and transfer of its rights, duties, obligations, and interests in and under its contracts with IPI, or if Mr. Levine had left the employ of Medex and made claims against Medex for breach of contract, Smiths Holdco may not have paid Medex the full acquisition price.

40.    Medex's offer to pay IPI at least $7,000,000 had obvious value to IPI. The amount Medex offered was equal to the low end of what Medex had acknowledged IPI would likely earn as "additional rents" by the end of the lease term. In fact, when Medex extended the lease term from 5 years to 6 years (under a one-time option that it had to do so), it did so stating to IPI its belief that it would earn enough from the IPI product lines that IPI would receive "additional rent" payouts over time of $7,000,000 to $10,000,000.

41.    Medex's offer to pay IPI at least $7,000,000 was an offer to buy IPI out of IPI's

11

contracts with Medex.

42.     In or about October or November, 2005, IPI, through Mr. Levine its president, accepted the offer that Mr. Arena and Medex made. IPI agreed to a buyout of IPI's contract rights, in exchange for a payment of not less than $7,000,000, payable prior to the resignation of Mr. Arena. IPI agreed that it would refrain from filing suit for Medex's breaches of the Asset Purchase Agreement and the Machinery And Equipment Production Lease, and agreed not to interfere with the assignment Medex had made of all of its rights, duties, obligations, and interests in and under its various agreements and schedules with IPI, and that Walter Levine would not resign his employment with Medex under the qualified resignation provisions of his employment agreement.

43.     Shortly after making the agreement described above, Mr. Arena began transferring his authority to others at Smiths Medical ASD.

44.     In December of 2005 Mr. Arena announced his resignation from Medex and Smiths Medical ASD, which was to become effective in March 2006. Soon after his announcement, he began cutting back his responsibilities and duties within both Medex and Smiths Medical ASD.

45.     Mr. Arena formally resigned in or before March 2006.

46.     Medex did not make the promised payment prior to Mr. Arena's formal resignation, and has not made it since the resignation. Medex has refused to pay the agreed upon amount of at least $7,000,000 that it contracted with IPI to pay prior to the resignation of Mr. Arena. Medex breached its oral contract with IPI.

47.     IPI fulfilled all of its obligations under the oral agreement it entered with Medex in October or November of 2005, as described above.

48.     IPI has been damaged by Medex's breach of its oral contract in the amount of at least

12

$7,000,000.

**WHEREFORE**, IPI prays that judgment be entered in its favor and against Medex, and that IPI be awarded the following relief:

a.     That the Asset Purchase Agreement, the Machinery And Equipment Production Lease, and the various other related agreements entered into between the parties be cancelled and terminated, and that the business and assets of IPI be returned to IPI in the same functional condition they were in when they were sold and leased to Medex, which remedy is provided for in the parties' agreements in the event of a breach;

b.     That IPI be awarded damages in an amount commensurate with the harm caused to IPI by Medex's various breaches of its agreements with IPI;

c.     That as the prevailing party, IPI be awarded all costs, expenses and attorneys fees it incurs in this litigation, as provided for in the agreements between the parties;

d.     That IPI be awarded damages for Medex's breach of its oral contract in an amount of not less than $7,000,000; and

e.     That this Honorable Court award IPI such other and further relief as it deems just and proper under the circumstances.

Respectfully submitted,

Peter W. Hahn (0070202) (Trial Attorney)
**BUCKINGHAM, DOOLITTLE & BURROUGHS, LLP**
191 West Nationwide Blvd., Suite 300
Columbus, Ohio 43215
Tel:    (614) 221-8448
Fax:   (614) 221-8590
E-Mail: (phahn@bdblaw.com)
*Counsel for Plaintiff*

13

Of Counsel:

Richard H. Lehman (Atty. No. 6204921)
Matthew D. Tanner (Atty. No. 6202508)
TANNER & LEHMAN LLC
53 West Jackson Boulevard
Suite 400
Chicago, Illinois 60604
(312) 588-1970

«CO2:369523_v1»

14