# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**Inhalation Plastics, Inc.,**

      **Plaintiff,**

                                           **Case No. 2:07-cv-116**
                                         **Judge Smith**

**v.**                                       **Magistrate Judge King**

**Medex Cardio-Pulmonary, Inc.,** *et al.***,**

      **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants/Counter-Plaintiffs Medex Cardio-Pulmonary, Inc. ("Medex CP") and Smiths Medical ASD, Inc.'s ("Smiths Medical") (collectively "Defendants" or "Counter-Plaintiffs") Motion for Partial Summary Judgment (Doc. 208); Counter-Defendant David Levine's Motion to Vacate Default Order of March 23, 2012, and Motion for Leave to File a Responsive Pleading (Doc. 206); Plaintiff/Counter-Defendant Inhalation Plastics, Inc. ("Inhalation Plastics" or "IPI") and Counter-Defendant Walter Levine's Motion for Summary Judgment (Doc. 217); Counter-Defendant David Levine's Motion for Summary Judgment (Doc. 218); Medex CP's Motion for Leave to File Instanter Sur-reply (Doc. 219); and Medex CP's Objection to Magistrate Judge's Order that Documents Produced by Medex CP are not Subject to Privilege (Doc. 244).  The motions are briefed and ripe for disposition.

For the reasons that follow, the Court **OVERRULES** Medex CP's Objection to the Magistrate Judge's Order; **GRANTS** Medex CP's Motion for Leave to File Instanter Sur-reply; **GRANTS** David Levine's Motion to Vacate Default Order of March 23, 2012; **GRANTS** David Levine's Motion for Leave to File a Responsive Pleading; **GRANTS** Medex CP and Smiths Medical's Motion for Partial Summary Judgment; **GRANTS in part and DENIES in part** IPI and Walter Levine's Motion for Summary Judgment; and **DENIES** Walter Levine's Motion for

Summary Judgment.

I.      **Background**

IPI is incorporated, and has its principal place of business, in the State of Illinois.  IPI manufactured and distributed medical products used in the treatment of patients having respiratory and anesthesia needs.  At all relevant times, Walter Levine owned and was the President of IPI, and David Levine was the Vice President of Sales and Marketing and Corporate Secretary of IPI.  Medex CP, also a manufacturer and distributor of medical products, is an Ohio corporation with its principal place of business in the State of California.

In May 2002, IPI entered into a series of agreements with Medex CP, including an Asset Purchase Agreement ("the APA" or "the Agreement") (Doc. 112-1), and a Machinery and Equipment Production Lease ("the Production Lease") (Doc. 112-2), for the purpose of arranging Medex CP's acquisition of IPI and its business operations.  Under these agreements, Medex CP acquired, through sale and lease, assets and other property of IPI.

Pursuant to the APA, IPI sold to Medex CP all of IPI's "rights, title and interest in and to all of those assets, rights and properties, which are used in or are related to the Business[1] or are necessary for the operation of the Business as presently conducted (the "Purchased Assets")." (Doc. 112-1).  The Purchased Assets included inventory, real property, and intellectual property. Additionally, all "tangible personal property, including, but not limited to machinery, equipment, fixtures, furniture, tools, [and] supplies . . . shall be leased" to Medex CP in accordance with the Production Lease.  Pursuant to the Production Lease, IPI agreed to lease to Medex CP machinery, equipment, and other assets necessary and utilized for the manufacture and production of IPI's product lines.  Medex CP did not purchase the machinery and equipment "given the unprofitable results of [IPI's] business operations in recent years, including the

---

[1] The "Business" is defined under the APA as IPI's business of "designing, developing, manufacturing, marketing and selling of disposable critical care devices and equipment utilized in the respiratory care, cardiopulmonary support and anesthesiology markets."  (Doc. 112-1, p. 1).

current year."  (Doc. 112-2).  Under the Production Lease, Medex CP agreed to pay a flat monthly payment to IPI, and "Additional Rent," which has been referred to as an "earnout," based on Medex CP's earnings from the sale of IPI products.

In conjunction with these agreements, Walter and David Levine ("the Levines"), executed a "Guaranty."  The Guaranty generally provides that the Levines agreed to indemnify and hold harmless Medex CP from injury, expense, or loss caused by any material misrepresentation of Inhalation Plastics or its failure to otherwise properly perform under the applicable agreements.

In March 2005, MedVest Holdings Corporation ("MedVest Holdings"), a holding company that owned Medex, Inc., which in turn owned Medex CP (the separate corporate entity that acquired the IPI business in 2002), merged with a subsidiary of Smiths Medical Holdco Limited ("Smiths Holdco"), Forest Acquisition Corp.  As a result of this merger, Medex CP remained a wholly owned subsidiary of Medex, Inc., which became a subsidiary of Smiths Holdco.

On January 3, 2012, IPI filed its Third Amended Complaint.  IPI's Third Amended Complaint sets forth these claims: IPI alleges that Medex CP breached an oral contract to pay IPI an amount not less than $7 million, in exchange for Walter Levine's agreement not to resign from his employment with Medex CP, and in exchange for his agreement not to sue Medex CP (Count I).  IPI also alleges that Medex CP breached the APA and the Production Lease by, *inter alia*, assigning rights under these agreements without the prior written consent of IPI (Count II). Finally, IPI asserts successor liability against Smiths Medical, alleging that Smiths Medical has assumed the liabilities of Medex CP to IPI (Count III).

On January 17, 2012, Medex CP and Smiths Medical filed their respective Answers and Counterclaims to IPI's Third Amended Complaint.  Medex CP and Smiths Medical assert the same claims against IPI and the Levines: a breach of contract claim against IPI (Count I); fraudulent inducement and fraud claims against IPI (Counts II and III); and a breach of contract

3

claim against Walter and David Levine (Count IV).  Generally, Medex CP alleges that IPI, by and through its agents, fraudulently induced Medex CP to enter the agreements effectuating its acquisition of IPI.  Medex CP additionally alleges that IPI, by and through its agents, made material misrepresentations and omissions before, during, and after the acquisition, concerning its assets.

More particularly, Medex CP and Smiths Medical allege that IPI breached the APA by "failing to provide to Medex CP IPI's assets in proper operating condition and repair, providing Medex CP with inventory that could not be used or sold within the ordinary course of business, and providing Medex CP with machinery and equipment which could not properly manufacture the products the equipment was supposed to produce."  (Doc. 188, ¶ 80).  They allege that IPI breached the Production Lease by "failing to provide all of the assets leased to Medex CP pursuant to the Production Lease in proper operating condition and repair."  *Id.*  Medex CP and Smiths Medical further allege that IPI made material misrepresentations to Medex CP and intentionally omitted facts material to Medex CP's acquisition of IPI's business, such as the condition of purchased and leased assets.  Finally, Medex CP and Smiths Medical allege that the Levines breached the express terms of the Guaranty by guarantying the truth, accuracy and completeness of the representations and warranties made by IPI to Medex CP pursuant to the APA, when said representations and warranties were untruthful, inaccurate and/or incomplete; guarantying the performance of all covenants made by IPI in relation to Medex CP's acquisition of IPI's business, when all covenants were not performed; and failing to indemnify and hold harmless Medex CP for all injury, expense, or loss arising directly or indirectly from the material untruth, inaccuracy or incompleteness of any representation or the breach of any covenant set forth in any of the documents executed pursuant to Medex CP's acquisition of IPI's business.

On March 23, 2012, the Clerk of Court filed an entry of default as to Counter-Defendant David Levine, as he had failed to answer, move, or otherwise plead as required by law to the Counterclaims filed by Medex CP and Smiths Medical.  On March 28, 2012, David Levine filed

4

a Motion to Vacate Default Order of March 23, 2012, and Leave to File a Responsive Pleading (Doc. 206). On March 30, 2012, Medex CP and Smiths Medical filed a joint Motion for Partial Summary Judgment (Doc. 208). On April 30, 2012, IPI and Walter Levine filed a Motion for Summary Judgment (Doc. 217). Also on April 30, 2012, David Levine filed a Motion for Summary Judgment, adopting and incorporating by reference the arguments set forth in IPI and Walter Levine's Motion for Summary Judgment (Doc. 218). These motions are all fully briefed and ripe for disposition.

In August 2012, the Magistrate Judge issued an Opinion and Order granting IPI's request for a determination that certain documents produced by Medex CP are not subject to privilege (Doc. 236). On September 11, 2012, Medex CP filed an Objection to this ruling (Doc. 244). IPI did not respond to the Objection, and the Objection remains pending.

The Court first will address Medex CP's Objection, then it will address David Levine's Motion to Vacate Default Order and Motion for Leave to File a Responsive Pleading, and then it will address the three Motions for (Partial) Summary Judgment.

## II. Objection to Order Determining that Documents Produced by Medex CP are not Subject to Privilege

Medex CP objects to the Magistrate Judge's Opinion and Order (Doc. 236) on Inhalation Plastic's Motion for Determination that Documents Produced by Medex are Not Subject to Privilege. Inhalation Plastics has not responded to Medex CP's Objection.[2]

### A. Standard of Review

When a party files timely objections to a magistrate judge's opinion and order concerning a nondispositive matter, the district judge "must consider [these] objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).

_____

[2] While Federal Rule of Civil Procedure 72(a) does not specifically provide for the filing of a response to objections to a magistrate judge's order on a nondispositive matter (unlike Rule 72(b) which concerns proposed findings and recommendations regarding dispositive motions), the Rules Advisory Committee's Comment to the 1983 Addition to Rule 72(a) states that "[i]t is also contemplated that a party who is successful before the magistrate will be afforded an opportunity to respond to objections raised to the magistrate's ruling."

General objections are insufficient to preserve any issues for review; "[a] general objection to the entirety of the magistrate's report has the same effects as would a failure to object." *Howard v. Secretary of Health and Human Services*, 932 F.2d 505, 509 (6th Cir. 1991).

The "clearly erroneous" standard applies only to factual findings made by the magistrate judge, while legal conclusions will be reviewed under the more lenient "contrary to law" standard. *Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992), *aff'd.*, 19 F.3d 1432 (6th Cir. 1994). "A finding is clearly erroneous only when the reviewing court is left with a definite and firm conviction that a mistake has been committed." *In re Search Warrants Issued Aug. 29, 1994*, 889 F. Supp. 296, 298 (S.D. Ohio 1995). If on review, the court determines that the evidence does not support the factual determination, or that the magistrate judge's construction of the evidence is not reasonable, the finding is clearly erroneous. *Geiger Bros. Mechanical Contractors v. Lockheed Martin Utility Services, Inc.*, 2000 WL 1456916, *1-2 (S.D. Ohio 2000) (citing *Heights Community Congress v. Hilltop Realty Corp.*, 774 F.2d 135, 140 (6th Cir. 1985)). Under the "contrary to law" standard, should the court determine on plenary review that the decision of the magistrate judge ignores or contradicts the law, or governing Rules of Civil Procedure, it should be rejected. *Id.*

## B. Discussion

The challenged Magistrate Judge's Opinion and Order was filed August 28, 2012, and concerns documents produced by Medex CP to IPI on May 30, 2011. The May 30th production was made in hard-copy format and contained approximately 7,500 pages, none of which was stamped "confidential." Of the 7,500 pages produced in the May 30th production, 347 are emails with one or more of the following people included as senders or recipients: Adam Jones, Smiths Medical's Division General Counsel; Yvonne Nichols, Smiths Medical's in-house attorney; and Felicia Jones, Smiths Medical's paralegal. In response to IPI's motion for a privilege determination, Medex CP asserted that the documents are protected by the attorney-client privilege and characterized those documents as inadvertently produced. IPI asserted that

the documents are not privileged and that any privilege has been waived.  IPI submitted, under seal, all 347 pages at issue from the May 30th production to the Magistrate Judge for an *in camera* inspection.

Upon reviewing the submitted documents and considering the arguments of the parties, the Magistrate Judge concluded that Medex CP failed to carry its burden of establishing that the attorney-client privilege may be properly applied to the documents submitted under seal (Doc. 236, p. 5).  However, the Magistrate Judge's "review of the documents submitted under seal suggests that many of the documents fall within the ambit of the attorney client privilege."  *Id.* Consequently, the Magistrate Judge analyzed whether the privilege was waived by Medex CP. After applying Rule 502(b) of the Federal Rules of Evidence, which addresses "inadvertent disclosure" of privileged matter, and balancing the corresponding factors in determining whether the disclosure was inadvertent, the Magistrate Judge concluded that "Medex waived the attorney client privilege otherwise applicable to the 347 documents in the May 30 production."  *Id.* at 10. Upon motion, the Magistrate Judge stayed enforcement of the August 28, 2012 Opinion and Order pending resolution of the Objection (Doc. 238).

Neither party challenges the Magistrate Judge's statement that "review of the documents submitted under seal suggests that many of the documents fall within the ambit of the attorney client privilege."  Medex CP argues that the Magistrate Judge erred in ruling that it waived the attorney-client privilege otherwise applicable to the 347 documents in the May 30, 2011 delivery.  Medex CP argues that the Magistrate Judge incorrectly burdened it with the need to prepare a privilege log, conflated requirements under the parties' protective order, misunderstood the manner in which the documents were reviewed and produced, and relied upon false statements made by IPI's counsel.

Federal Rule of Evidence 502(b) determines whether an inadvertent disclosure of privileged information or communications operates as a waiver of attorney-client privilege.  This rule states:

**Inadvertent disclosure.** When made in a Federal proceeding or to a Federal office or agency, the disclosure does not operate as a waiver in a Federal or State proceeding if:

(1) The disclosure is inadvertent;

(2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and

(3) the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

When addressing an inadvertent disclosure, courts in the Sixth Circuit and Ohio generally weigh and consider the following factors: (1) the reasonableness of precautions taken in view of the extent of document production, (2) the number of inadvertent disclosures, (3) the magnitude of the disclosure, (4) any measures taken to mitigate the damage of the disclosures, and (5) the overriding interests of justice. *Evenflo Co. v. Hantec Agents Ltd.*, No. 3:05-CV-346, 2006 WL 2945440, *6 (S.D. Ohio Oct.13, 2006) (citing *Fox v. Massey–Ferguson, Inc.*, 172 F.R.D. 653, 671 (E.D. Mich. 1995)). The burden of showing that a privilege has not been waived rests with the party claiming the privilege. *Mainstay High Yield Corp. Bond Fund v. Heartland Indus. Partners, L.P.*, 263 F.R.D. 478, 480 (E.D. Mich. 2009) (citing *United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997)).

Medex CP argues that the Magistrate Judge misconstrued the applicable legal standards and erroneously concluded that it did not act reasonably as it relates to the inadvertent production of documents. Medex CP further argues that the Magistrate Judge improperly penalized it for not producing a privilege log with respect to the inadvertently produced documents because Rule 502(b) does not require a privilege log. According to Medex CP, it took reasonable steps to prevent and rectify the inadvertent disclosure. In support of its Objection, Medex CP submits evidence that was not presented to the Magistrate Judge. Medex CP argues that this evidence demonstrates that the production was truly inadvertent, and that it asserted the privilege as soon as opposing counsel first mentioned documents involving its own legal counsel.

8

More specifically as it relates to the production of a privilege log, Medex CP asserts that "it was *impossible* for Medex CP to produce a privilege log for documents that only IPI's counsel had identified but refused to even provide Bates numbers to Medex CP." (Doc. 244, p. 12) (emphasis sic). Medex CP also asserts that the documents inadvertently produced had been reviewed by attorneys, prior to the production, and designated as privileged. There is a disconnect between these two assertions, as Medex CP has not explained why, if the produced documents had been reviewed and designated as privileged, it could not produce a privilege log. Whether a privilege log is required under the rules is ultimately immaterial as it relates to this case. Medex CP's production of a privilege log would have substantiated its assertion that it took reasonable precautions to prevent an inadvertent disclosure. The Magistrate Judge essentially found that Medex CP's failure to produce a privilege log discredited its attempt to establish that it took reasonable precautions to prevent an inadvertent disclosure. Medex CP fails to show that this finding is clearly erroneous or contrary to law.

As it relates to the newly produced evidence in support of Medex CP's position, the Court finds that it would be illogical to conclude that a magistrate judge's factual finding was clearly erroneous based on evidentiary material that was not before the magistrate judge for review. When a district judge reviews a magistrate judge's resolution of a nondispositive matter, it is not a *de novo* review, as it is in relation to a magistrate judge's recommendation as to a dispositive matter. *See* Fed. R. Civ. P. 72(b)(3) (permitting a district judge to receive further evidence in resolving an objection to a magistrate judge's proposed findings and recommendations as to a dispositive matter). In fact, some courts have found that Rule 72(a) precludes the district court from considering factual evidence that was not presented to the magistrate judge when reviewing a nondispositive matter. *See Haines v. Liggett Grp., Inc.*, 975 F.2d 81, 91 (3d Cir. 1992) ("The district court is not permitted to receive further evidence; it is bound by the clearly erroneous rule in reviewing questions of fact."); *Thai Lao Lignite (Thailand) Co., Ltd. v. Government of Lao People's Democratic Republic*, No. 10 Civ. 5256,

2013 WL 541259, 2 (S.D. N.Y. 2013) (limiting its analysis of objection to ruling on nondispositive matter to the factual record before the magistrate judge); *State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs.*, 375 F. Supp.2d 141, 158 (E.D. N.Y. 2005) (refusing to consider new evidence on nondispositive issue based on reading of Rule 72 and lack of case law to the contrary).

Even if the additional evidence is considered, it does not mandate an alternate conclusion than that reached by the Magistrate Judge. In support of its Objection, Medex CP relies heavily on a declaration of one of its attorneys, Richard Pearl. The declaration presents the following information. Mr. Pearl states that Medex CP retained an outside vendor to assist in the production of documents in this litigation. The vendor would review documents and indicate its preliminary findings in a database. The documents would then be delivered to Medex CP's attorneys at Morgan, Lewis & Bockius LLP ("Morgan Lewis"). The documents would be prepared for a second level review by attorneys at Morgan Lewis, including reviews for privilege. Mr. Pearl declares that the vendor delivered to Morgan Lewis approximately 557 documents that had been identified for a second-level review for potential privileges, and that three attorneys, including himself, "reviewed these documents prior to May 30, 2011 and had placed tags of 'privilege' on 327 of the 557 documents." (Pearl Decl. ¶ 6). The documents that the attorneys had tagged as privileged should not have been produced, but, due to an administrative oversight, they were produced to IPI, in print format, on May 30, 2011. Mr. Pearl further declares that after IPI's counsel requested to take the deposition of members of Smiths Medical's legal team and informed him that documents involving the legal team had been received, "Morgan Lewis had a paralegal check the document production to determine if the May 30, 2011 documents had correct privilege designations. The documents did, in fact, appear with 'privilege' designations in Morgan Lewis' database." (Pearl Decl. ¶ 13).

Thus, on the one hand, Medex CP asserts that its attorneys at Morgan Lewis "tagged" 327 documents with a "privilege" notation, that these documents were inadvertently produced

due to an administrative oversight, and that, after learning that IPI received documents involving Smiths Medical attorneys and a paralegal, Morgan Lewis reviewed the document production to confirm that the May 30, 2011 documents had correct privilege designations in Morgan Lewis' database.  On the other hand, Medex CP asserts that it "was *impossible* for Medex CP to produce a privilege log for documents that only IPI's counsel had identified but refused to even provide Bates numbers to Medex CP."  (Doc. 244, at 12) (emphasis sic).  The Court notes that Medex CP seeks to place blame on IPI's counsel for not providing Bates numbers to it.  But the focus of a waiver analysis is on the producing parties' conduct, not the conduct of the receiving party. After the documents were produced and Medex CP learned that IPI's counsel received documents involving Smiths Medical's legal team, Medex CP did not identify any particular document(s) covered by the attorney-client privilege, even though it allegedly reviewed the document production to determine and confirm whether the documents had been tagged with a "privileged" designation.  If Medex CP's counsel was able to confirm pre-production attorney review of the documents produced on May 30, 2011, it should have been able to provide a notice to IPI's counsel that identified, with sufficient particularity and comprehensiveness, which documents were privileged.  Instead, Medex CP made a generalized claim of privilege, which is not consistent with the specificity requirement of Rule 26(b)(5)(B).  Medex CP's Objection does not explain this discrepancy.

Medex CP argues that the Magistrate Judge improperly relied heavily on the fact that it did not stamp the inadvertently produced documents as "'confidential' as provided by the *Stipulated Protective Order*, Doc. No. 75, at 3."  (Doc. 244, at 13, citing Doc. 236).  Medex CP asserts that a designation of "confidential" under the Stipulated Protective Order is not pertinent to privilege issues, because it only relates to confidential information such as trade secrets, research and development, finances, and similar private or proprietary information.  Although communications subject to the attorney-client privilege may not meet the definition of "confidential information" under the Stipulated Protective Order, Medex CP does not explain

11

why the Magistrate Judge's observation that the disclosed documents were not marked as confidential renders the decision clearly erroneous or contrary to law.  Thus, Medex CP's argument in this regard is not persuasive.

Medex CP argues that the Magistrate Judge erred in failing to consider IPI's and its counsel's obligations under Rule 26(b)(5)(B) and Ohio Professional Conduct Rule 4.4(b).  Rule 26(b)(5)(B) provides as follows:

> If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it.  After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim.  The producing party must preserve the information until the claim is resolved.

Ohio Professional Conduct Rule 4.4(b) provides that "A lawyer who receives a document relating to the representation of the lawyer's client and *knows* or *reasonably should know* that the document was inadvertently sent shall promptly notify the sender."

Medex CP asserts that upon learning that IPI was in possession of documents involving Smiths Medical's counsel, it asserted the privilege and raised the issue of inadvertent disclosure. Medex CP further asserts that upon receiving notice from it, IPI did not comply with its obligations as the receiving party and acted in bad-faith in response to the asserted privilege.  As suggested above, Medex CP's focus on IPI's obligations and alleged misconduct as the receiving party misses the mark.  It was Medex CP's burden to demonstrate that it took reasonable steps to rectify the error.  As noted by the Magistrate Judge, the 2006 advisory committee notes to Rule 26 of the Federal Rules of Civil Procedure state in part:

> A party asserting a claim of privilege or protection after production must give notice to the receiving party.  That notice should be in writing unless the circumstances preclude it. . . . The notice should be as specific as possible in identifying the information and stating the basis for the claim. . . . [T]he notice should be sufficiently detailed so as to enable the receiving party and the court to understand the basis for the claim and to determine whether waiver has occurred.

The Magistrate Judge found that Medex CP failed to take adequate measures to rectify or

mitigate the damage of the disclosures, specifically noting that Medex CP's notice to IPI indicated that documents in IPI's possession might contain inadvertently produced, privileged communications, and thus did not identify any particular documents covered by the privilege. The advisory committee notes state that "notice should be as specific as possible," but Medex CP's notice was not very specific in view of its assertion that it had already "tagged" the alleged privileged documents that were produced on May 30, 2011.  Thus, the Magistrate Judge's conclusion as to whether Medex CP took adequate measures to rectify or mitigate the damages of the disclosures is not clearly erroneous or contrary to law.

Finally, Medex CP argues that the Magistrate Judge was misled by misrepresentations IPI made in briefing.  Medex CP asserts that IPI falsely claimed that "counsel for Medex on several occasions, and as recently as September of this year, acknowledged to counsel for IPI that his office never reviewed the Memorial Day production[.]"  (Doc. 171, at 16).  Additionally, Medex CP asserts that IPI falsely claimed that "[n]othing was done to protect the privilege in the first instance."  (Doc. 171, at 3).  Medex CP claims that the following statement by its counsel on the record during the deposition of Barb Law on September 1, 2011, proves that these claims were false and that IPI's counsel knew that the documents had been reviewed twice, preliminarily by a vender and then by Medex CP's law firm:

> We have been and still are conducting a very extensive review of the hundred-and-some thousand documents.  And as you know, you make either express statements or comments alluding to the fact that there have been a ton of documents produced in this case.  Part of the review, the initial review for production was not done by my firm, but was done by a third-party vendor.  So we have a lot of review that we have to do at my firm to make sure that we capture all of the documents that we now understand some, at least some are inadvertently produced privileged documents.

(Doc. 244, Ex. G, at 247).

Medex CP argues that the Magistrate Judge's conclusions reflect an adoption of IPI's statements regarding what was done to protect the asserted privileged communications.  This argument assumes that Medex CP demonstrated conclusively that adequate protections were in place to prevent an inadvertent disclosure.  However, the Magistrate Judge concluded that

Medex CP failed to establish that it took reasonable precautions to prevent an inadvertent disclosure or that it took adequate measures to rectify or mitigate the damage of the disclosure. Medex CP's counsel's statement at a deposition does not show that these conclusions were clearly erroneous, as it does not explain the failure to produce a privilege log. If anything, the statement is unclear as to whether counsel was asserting that the documents that were produced on May 30, 2011 had been reviewed and tagged as privileged by attorneys prior to the production.

In summary, the Court has reviewed the Magistrate Judge's Opinion and Order in light of Medex CP's Objection, and finds that the Magistrate Judge's Opinion and Order is neither clearly erroneous, nor contrary to law. *See* U.S.C. § 636(b)(1)(A); Fed. R. Civ. 72(a). The Court therefore **OVERRULES** Medex CP's Objection to the Magistrate Judge's August 28, 2012 Opinion and Order and **AFFIRMS** said Opinion and Order. Accordingly, the previously imposed stay is **VACATED**.

### III. Motion to Vacate and Motion for Leave to File Responsive Pleading

Counter-Defendant David Levine, who is proceeding *pro se*, moves pursuant to Rule 55(c) of the Federal Rules of Civil Procedure to vacate the Clerk's entry of default entered on March 23, 2012. David Levine correspondingly also moves for leave to file a responsive pleading. Counter-Plaintiff Medex CP opposes these motions. Medex CP argues that David Levine has not demonstrated that his failure to answer or otherwise plead was the result of excusable neglect as required under Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure.[3]

---

[3] On May 2, 2012, Medex CP moved for leave to file instanter a sur-reply to David Levine's reply memorandum in support of his motion to vacate (Doc. 219). Medex CP asserts that the purpose of the sur-reply is to correct a factually-incorrect and misleading statement made by David Levine in his reply suggesting that Medex CP and its counsel manipulated documents produced in this case. For good cause shown, the Court **GRANTS** Medex CP's motion. The alleged manipulation relates to the domain name reflected on emails produced in discovery. Medex CP has provided a reasonable explanation for why many email documents produced in this case reflect a different domain name than when they were actually sent. Medex CP explains that emails with a domain name of "@medex.com" when originally sent, displayed a domain name of "@smiths-medical.com" when printed and produced for discovery as a result of the

### A.       Standard of Review

Rule 55(c) provides that the Court "may set aside an entry of default for good cause."

Under the "good cause" standard of Rule 55(c), "the district court enjoys considerable latitude"

to grant a defendant relief from a default entry.  *Waifersong, Ltd. v. Classic Music Vending*, 976

F.2d 290, 292 (6th Cir. 1992).  Within the Sixth Circuit, "cases discussing motions to set aside

default under Rule 55(c) are extremely forgiving to the defaulted party and favor a policy of

resolving cases on the merits instead of on the basis of procedural missteps."  *U.S. v. $22,050.00*

*U.S. Currency*, 595 F.3d 318, 322 (6th Cir. 2010) (citing cases).  In determining whether good

cause exists, the district court must consider:  (1) whether culpable conduct of the defendant led

to the default, (2) whether the defendant has a meritorious defense, and (3) whether the plaintiff

will be prejudiced.  *Id.* at 324.[4]

In order for a party to show prejudice from the setting aside of a default, a showing of

delay in tendering a response is insufficient.  *United Coin Meter Co. v. Seaboard Coastline*

*Railroad*, 705 F.2d 839, 845 (6th Cir. 1983) ("[m]ere delay in satisfying a plaintiff's claim, if it

should succeed at trial, is not sufficient prejudice to require denial of a motion to set aside a

default judgment").  Thus, to be deemed prejudicial, "the delay must result in tangible harm such

as loss of evidence, increased difficulties of discovery, or greater opportunity for fraud or

collusion."  *Thompson v. American Home Assur. Co.*, 95 F.3d 429, 433-34 (6th Cir. 1996)

(citation omitted).

---

integration of computers systems after Medex CP moved under the control of Smiths Medical.
Insofar as David Levine charges Medex CP and its counsel with improperly altering documents
from their original form as part of the discovery process, the Court finds this accusation to be
unsubstantiated.

   [4] Rule 6(b)(1)(B) provides that when "an act may or must be done within a specified
time" the court may provide an extension if the "party failed to act because of excusable
neglect."  Rule 55(c)'s "good cause" standard, however, is less burdensome than the "excusable
neglect" standard.  *See Scott v. Power Plant Maint. Specialists, Inc.*, No. 09-CV-2591, 2010 WL
1881058, at *4 (D. Kan. May 10, 2010); *see generally McGinnis v. Rentech Solutions, Inc.*, No.
2:11-cv-670, 2012 WL 1537611 (May 1, 2012) (Kemp, M.J.) (applying good cause standard to
motion to set aside entry of default and corresponding leave to file answer instanter).

In analyzing whether a defendant has a meritorious defense, "likelihood of success is not the measure. Rather, if any defense relied upon states a defense good at law, then a meritorious defense has been advanced." *United Coin Meter Co.*, 705 F.2d at 845 (citations omitted). "[T]he criterion is merely whether 'there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default.'" *Dassault Systemes, SA v. Childress*, 663 F.3d 832, 843 (6th Cir. 2011) (citations and internal quotations omitted). "Thus, even conclusory assertions may be sufficient to establish the 'hint of a suggestion' needed to present a meritorious defense." *Id.*

As to the culpable conduct of the defaulting party factor, if the other two factors generally favor setting aside the default, the Court may accept any "credible explanation for the delay that does not exhibit disregard for the judicial proceedings." *Shepard Claim Service, Inc. v. William Darrah & Associates*, 796 F.2d 190, 195 (6th Cir. 1986). In this regard, the Court may consider the length of delay beyond the deadlines, and also whether or not the conduct has established a "pattern of disregard for court orders or rules." *Id.* Carelessness, without some expressed intent to impede proceedings, is not sufficient to constitute culpable conduct. *Id.* A "court considers . . . defendant's culpability, in the general context of determining whether a petitioner is deserving of equitable relief." *Waifersong, Ltd. v. Classic Music Vendors*, 976 F.2d 290, 292 (6th Cir. 1992).

### B. Discussion

The March 23, 2012 entry of default against David Levine was not the first entered against him in this case. On March 17, 2011, Medex CP requested the Clerk to enter default in this matter against David Levine (Doc. 130) on the grounds that he failed to appear or otherwise respond to the Amended Counterclaim (Doc. 112), which had been filed in response to IPI's First Amended Complaint (Doc. 34). Count IV of the Amended Counterclaim presented essentially the same claim as Count IV of the subsequently filed, and currently operative, Counterclaims of Medex CP and Smiths Medical that were filed in response to IPI's Third

16

Amended Complaint (Doc. 187-188).  On March 18, 2011, the Clerk filed an entry of default as to David Levine (Doc. 131).  On March 28, 2011, attorney Timothy Tullis filed an appearance on David Levine's behalf and an unopposed motion to vacate the entry of default (Docs. 132-33).  The same day, the Court granted the motion and vacated the entry of default (Doc. 134).  On March 29, 2011, attorney John Meehan filed a motion for leave to appear pro hac vice, which was granted on March 30, 2011 (Doc. 136).

On April 4, 2011, David Levine, represented by counsel, filed a motion to dismiss Count IV of Medex CP's Amended Counterclaim, adopting and incorporating by reference the arguments presented in Walter Levine's earlier filed motion to dismiss (Doc. 137).  On June 8, 2011, the Court denied the Levines' separately filed motions to dismiss (Doc. 144), and on June 22, 2011, David Levine, still represented by counsel, filed his Answer and Affirmative Defenses to Count IV of the Amended Counterclaim (Doc. 146).  Later in June 2011, John Meehan withdrew as David Levine's counsel.  In October 2011, Timothy Tullis withdrew as David Levine's remaining counsel, leaving David Levine without representation in this litigation.

In an order filed October 14, 2011, the Court advised David Levine that, if he proceeded without the assistance of counsel he must still "participate in the litigation," and that his "failure to do so may result in the entry of his default."  (Doc. 159).  On the same day, IPI's Second Amended Complaint was filed (Doc. 166).  On January 3, 2012, IPI's Third Amended Complaint was filed (Doc. 185).  Two weeks later, Medex CP and Smiths Medical filed their Counterclaims to the Third Amended Complaint (Doc. 187-188).  Upon David Levine's failure to respond to these Counterclaims, Medex CP and Smiths Medical requested an entry of default (Doc. 204).  The Clerk of Court filed the entry of default currently at issue on March 23, 2012.  Five days later, David Levine filed his Motion to Vacate.

The Court finds that David Levine has satisfied the "good cause" standard of Rule 55(c).  Medex CP does not argue that David Levine has not asserted a meritorious defense.  Indeed, David Levine asserts various defenses "good at law" to the claims against him, including that

they are barred by the terms of the contract and by the applicable statute of limitations.  Instead, Medex CP argues that it has been prejudiced by David Levine's delay and that the reason given for the delay is inexcusable.  More particularly, Medex CP asserts that it expended time and resources requesting that the Clerk enter default against David Levine.  Medex CP also asserts that it and Smiths Medical have been prejudiced because they filed their joint Motion for Partial Summary Judgment without the benefit of David Levine's response to their Counterclaims. Medex CP does not allege, however, that setting aside the default would result in a "tangible harm," such as loss of evidence, create discovery difficulties, or increase the chances for fraud. Furthermore, considering the substance of David Levine's filings in response to the previously filed counterclaim, Medex CP already was on general notice of David Levine's position regarding the Counterclaim to the Third Amended Complaint.  Thus, Medex CP will not be prejudiced by the vacating of the default.

As it relates to the culpability of David Levine's conduct, Medex CP denounces his explanation for his delay as being "difficult to fathom."  (Doc. 214, p. 5).  Medex CP also asserts that David Levine has conducted himself in bad faith in this matter by using documents during depositions that were not previously provided to Medex CP's counsel and refusing to answer questions during his deposition.  David Levine, who is proceeding *pro se*, asserts that he "was unaware that an answer was required to the Counterclaim to the Third Amended Complaint filed by Medex Cardio-Pulmonary and Smiths Medical ASD, Inc." (Doc. 206, pp. 1-2).  The Court finds that David Levine's incorrect presumption that a response to the Counterclaim to the Third Amended Complaint was not necessary, is not entirely unreasonable, in view of the previously filed document that addressed essentially the same substantive claims against him within the same case.  While *pro se* litigants are expected to adhere to applicable federal procedural rules, *see, e.g.*, *In re G.A.D., Inc.*, 340 F.3d 331, 335 (6th Cir. 2003), ignorance or neglect as it relates to these rules does not demonstrate an intent to disrespect the court proceedings.  *See Dassault Systemes, SA*, 663 F.3d at 841.

18

Therefore, the Court finds that David Levine has met the requirements of Rule 55(c), and the Clerk's entry of default against him is hereby **VACATED**.

## IV. Motions for (Partial) Summary Judgment

Medex CP and Smiths Medical move for summary judgment on the entirety of Count I and a portion of Count II of Inhalation Plastics' Third Amended Complaint (Smiths Medical is joined in this action under a theory of successor liability, which forms the basis of Count III of Inhalation Plastics' Third Amended Complaint).  Inhalation Plastics and Walter Levine move for summary judgment as to Counts II and III of Inhalation Plastics' Third Amended Complaint and for summary judgment on all Counts of the Counterclaims of Medex CP and Smiths Medical. David Levine moves for summary judgment as to Count IV of Medex CP and Smiths Medical's Counterclaims.

### A. Standard of Review

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Therefore, a party may move for "partial summary judgment" as a means to resolve only certain claims or defenses.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir.

19

2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587. The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53. Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish

20

that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### B.       Discussion

As detailed above, there are seven claims asserted in this action.  IPI asserts a breach of oral contract claim against Medex CP (Count I), a breach of written contract claim against Medex CP (Count II), and a successor liability claim against Smiths Medical (Count III).  Medex CP and Smiths Medical assert four counterclaims: a breach of contract claim against IPI (Count I), fraudulent inducement and fraud claims against IPI (Counts II and III), and a breach of contract claim against Walter and David Levine (Count IV).  IPI and Walter Levine move for summary judgment on Counts II and III of IPI's Third Amended Complaint, and summary judgment on all four Counts of the Counterclaims of Medex CP and Smiths Medical.  Medex CP and Smiths Medical move for summary judgment on the entirety of Count I, and a portion of Count II, of IPI's Third Amended Complaint.  David Levine moves for summary judgment on Count IV of the Counterclaims filed by Medex CP and Smiths Medical.  The Court will address the claims subject to the motions for partial summary judgment in turn.

### 1.       Count I of Third Amended Complaint – Breach of Oral Contract

Medex CP and Smiths Medical assert that they are entitled to summary judgment as to IPI's breach of oral contract claim.  Medex CP and Smiths Medical argue that this claim fails because there was no offer, any terms discussed were too indefinite to form an oral contract, there was no consideration, and non-party witnesses denied the existence of any oral contract.  IPI argues that there are genuine issues of material fact relating to its breach of oral contract claim because it has presented competent evidence of its oral contract with Medex CP.

As a preliminary matter concerning this claim, the Court notes that the parties disagree as to whether Ohio or California law applies to the oral contract claim.  However, by Order filed

December 3, 2007, this Court determined that Ohio law governs this claim.  (Doc. 22, p. 6).  IPI presents no compelling reason to deviate from that determination.  Also, while IPI extensively cites California law on the pertinent issues relating to this claim, it does not identify any substantive difference in Ohio or California law on these issues, and in fact states that there "appear to be few if any material differences between California and Ohio law on the operative issues."  (Doc. 224, p. 9).  Furthermore, IPI asserts that it must establish the existence of an oral contract by the "preponderance of evidence" standard, not the "clear and convincing evidence" standard as indicated in the Court's December 3, 2007 Order.  Regardless of which of these two burdens of proof applies, however, IPI's breach of oral contract claim fails as a matter of law for the following reasons.

To prove a breach of contract, oral or written, a plaintiff must establish the existence and terms of a contract, the plaintiff's performance of the contract, the defendant's breach of the contract, and damages or loss to the plaintiff.  *Powell v. Grant Med. Ctr.*, 71 N.E.2d 874, 881 (Ohio Ct. App. 2002).  To prove the existence of a contract, a plaintiff must show that the parties consented to the terms of the contract, that both parties had a "meeting of the minds," and that the terms of the contract are definite and certain.  *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 575 N.E.2d 134, 136-37 (Ohio 1991).  That is, a valid contract consists of an offer, acceptance, and consideration.  *Tersigni v. Gen. Tire, Inc.*, 633 N.E.2d 1140, 1142 (Ohio Ct. App. 1993).  An offer is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it."  *Reedy v. Cincinnati Bengals, Inc.*, 758 N.E.2d 678, 682 (Ohio Ct. App. 2001).  Courts determine the existence of a contract as a matter of law.  *Motorists Mut. Ins. Co. v. Columbus Fin., Inc.*, 861 N.E.2d 605, 608 (Ohio Ct. App. 2006).

A contract is not enforceable when the terms are not sufficiently definitive.  *Isquick v. Classic Autoworks, Inc.*, 627 N.E.2d 624, 627 (Ohio Ct. App. 1993). A valid contract must be specific as to its essential terms, such as the identity of the parties to be bound, the subject matter

of the contract, and consideration.  *Alligood v. Procter & Gamble Co.*, 594 N.E.2d 668, 669 (Ohio Ct. App. 1991).  The terms of a contract are sufficiently certain or definite where they "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Mr. Mark Corp. v. Rush, Inc.*, 464 N.E.2d 586, 589 (Ohio Ct. App. 1983), quoting Restatement of the Law 2d, Contracts (1981) 92, Section 33.  Furthermore, " '[a]n offer which appears to be indefinite may be given precision by usage or trade or by course of dealing between the parties. Terms may be supplied by factual implication, and in recurring situations the law often supplies a term in the absence of agreement to the contrary . . . Where the parties have intended to conclude a bargain, uncertainty as to incidental or collateral matters is seldom fatal to the existence of the contract.' " *Mr. Mark Corp.*, 464 N.E.2d at 590, quoting Restatement of the Law 2d, Contracts (1981) 95, Section 33, Comment f.

Thus, if it can be determined that the parties intend to be bound, a court may fashion less essential terms that were omitted, in order to reach a fair and just result.  *Litsinger Sign Co. v. American Sign Co.*, 227 N.E.2d 609 (Ohio 1967).  However, "if the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the court to determine what the agreement is and to enforce it without, in effect, 'making a contract for the parties,' no enforceable obligation results." *Id.* at 619.

In support of its breach of oral contract claim, IPI asserts that Walter Levine testified that Dominick Arena, acting on behalf of Medex CP, offered him $7 to $10 million in exchange for his agreement to stay with the company and not to institute a lawsuit on behalf of IPI and against Medex CP for breach of contract.  IPI further asserts that Walter Levine accepted the offer and a binding oral contract was formed.  The evidence cited by IPI, however, does not support its contention that an oral contract was formed.

Walter Levine testified at his February 13, 2012 deposition that he expressed his anger to Mr. Arena upon learning of the merger involving Medex CP and Smiths Medical.  Mr. Arena

allegedly said, "Don't worry about it, Walter.  I'll take care of it."  (Levine Dep. 83).  Mr. Levine

asked, "What in the hell does that mean?" and Mr. Arena said, "I'll get you paid out."  *Id.*  In

fact, Mr. Levine repeatedly testified to some variation of the "I'll get you paid out" statement by

Mr. Arena.  For example, Mr. Levine testified that Mr. Arena said, "I'll get you your seven to

ten.  As a matter of fact . . . If we can't get it from Smiths, we'll get it back from Medex CP."  *Id.*

at 136.  Mr. Levine further testified as follows:

> Q.  Did Mr. Arena at that time tell you he had the authority to get you paid out
> without any approval from anybody else at Smiths Corporation?
>
> A.  No. He told me that he had the authority.  He's the president of the
> corporation, of that division.  He assured me he would pay it out.  He would get it
> paid out either through Smiths or through Medex CP.
>
> Q.  And that was in October 2005?
>
> A.  My best recollection was in the month of October of 2005, the tag [sic] end of
> 2005.
>
> * * *
>
> Q.  Is it your testimony that Mr. Arena made an offer to you on behalf of Smiths
> that you would be paid 7 to $10 million for a buyout of your claim?
>
> A.  Yeah.
>
> Q.  What were the other terms?
>
> A.  That I not leave the company, I not quit and not bring the lawsuit.
>
> Q.  Did you accept that offer?
>
> A.  I accepted the fact that he said that he would get me paid out 7 to $10 million.
>
> Q.  Did you accept the offer?
>
> A.  Sure.
>
> Q.  What did you tell him?
>
> A.  Fine, I'll stay on.  And I did.
>
> Q.  When were you supposed to be paid?  Did this offer that you accepted –
>
> A.  He didn't give me a time frame.
>
> Q.  There was no –

24

A.  He was going to have it done.

*Id.* at 139-40.

In response to Medex CP and Smiths Medical's Motion for Summary Judgment, IPI

submitted a declaration of Walter Levine, dated May 18, 2012.  Mr. Levine testified as follows:

> Mr. Arena and I had several settlement discussions between the summer of 2005 and the end of October of 2005.  These all occurred in Carlsbad, California, and to the best of my recollection all of them took place at the offices of Medex, Inc.  Dominick Arena and I were the only participants in these conversations.  In several of these discussions I reminded him of how he had told me at the outset of the contractual relationship between IPI and Medex CP that it was his hope that IPI would receive somewhere in the range of $7 to 10 million in an earnout under the Machinery and Equipment Production Lease IPI had entered with Medex CP.  During these settlement discussions he at first stated to me that he was going to try to get Smiths Medical to pay IPI $7 to 10 million.  He asked me to not resign and to not bring suit or to do anything that might interfere with the Smiths takeover.  We had several of these discussions.  After long delays, Mr. Arena told me at the end of September or the early part of October 2005, that he was unable to get Smiths to commit to pay, that he had been trying to make the case that Smiths should make the payment, and that he was going to be out of the loop.  I told Mr. Arena that I was going to immediately resign and that I was going to bring a lawsuit against Medex CP for breach of its contracts with IPI.
>
> Mr. Arena told me to hold off on resigning and bringing suit, and that he would go back again and try to get authority to settle.  In late October 2005, I had another conversation with Mr. Arena, again in Carlsbad, California.  He told me that he had settlement authority and that he was going to continue working on it and that he would present me with a settlement offer.  A short time later, at the end of October 2005, Mr. Arena had another meeting with me in Carlsbad, California.  During that meeting he made a specific offer to me to settle IPI's disputes with Medex CP.  He said he would make another run at getting Smiths Medical to pay IPI the $7 to 10 million, since Smiths Medical Holdco had acquired MedVest Holdings, and that if Smiths Medical would not make the payment, Medex CP would make the payment itself.[] He indicated to me several times (as I testified in my deposition at 190) that the payment would be forthcoming before the time he stepped down as president of Medex, Inc. Medex CP and an operating division of Smiths Medical, which he indicated would be at the beginning of 2006, just after the new year.  In exchange, he asked that I not resign my position with the company, and that I not institute on behalf of IPI any lawsuit against Medex CP for breach of contract.  At that same meeting I accepted the offer and agreed to the terms.  I believed that IPI and Medex CP had a binding settlement agreement at that time, and I did not resign my position or bring suit.

(Doc. 224-4).

As discussed above, for a contract to exist, there must be a meeting of the minds and the

essential terms of the contract must be definite and certain, or these terms must be at least

reasonably ascertainable.  Thus, a contract that is not sufficiently definitive is not enforceable, and a court must not "make a contract for the parties."  Here, the purported terms of the alleged contract were not sufficiently definite and certain to demonstrate a meeting of the minds between the parties so as to create an enforceable contract.  IPI alleges that Medex CP agreed to pay it $7 to 10 million in exchange for Walter Levine's agreement not to leave the company or initiate a lawsuit against Medex CP.  The amount of this purported settlement clearly would be an essential term, and the $3 million range can only be viewed as significant and indefinite.  These numbers appear to be linked to the amount that Mr. Arena allegedly told Mr. Levine, in 2002, would be a possible "earnout" to IPI as a result of the contractual relationship between IPI and Medex CP.  Not only is there no extrinsic standard or specified means for defining the amount of any settlement, there is no suggestion as to the manner in which this large sum of money would be paid.

According to Walter Levine's deposition testimony, Mr. Arena, on multiple occasions, indicated that he would "see to it" that Walter Levine receive $7 to 10 million.  (Walter Levine Dep., p. 190).  This testimony indicates that, while Mr. Arena may have committed to trying to help Walter Levine and IPI receive millions of dollars, further action was necessary to facilitate and finalize any such settlement.  Walter Levine's declaration, which was signed and submitted after Medex CP and Smiths Medical filed their joint Motion for Summary Judgment, suggests that no further action was necessary for Mr. Arena to bind Medex CP.  Viewed in this way, Walter Levine's declaration materially contradicts his earlier testimony that further action was necessary to facilitate the making of an offer that could bind Medex CP.  Walter Levine's declaration does not create a genuine issue of material fact, however, as it is well-settled that a party cannot create a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony, without explaining the contradiction or attempting to resolve the disparity.  *Arel, S.R.I. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006).

In the final analysis, the terms of the purported contract are not sufficiently certain so as

26

to provide a basis for determining the existence of a breach and for giving an appropriate remedy. This lack of certainty is reflected by Walter Levine's deposition testimony indicating that further action was needed to facilitate the making of an offer that could bind Medex CP, if accepted.

Therefore, Inhalation Plastics' claim for breach of oral contract fails as a matter of law.

### 2.      Count II of Third Amended Complaint – Breach of Written Contract

By Count II of the Third Amended Complaint, IPI alleges that Medex CP breached several provisions of agreements between IPI and Medex CP reached in 2002, including "anti-assignment" clauses, provisions relating to the maintenance of leased machinery and equipment, a provision requiring Medex CP to regularly provide certain financial information to IPI, and provisions requiring the allocation of operating expenses and costs to IPI product lines to properly calculate "additional rents" to be awarded to IPI under the Production Lease. Defendants move for summary judgment as to IPI's contention that the 2005 merger of MedVest Holdings and Smiths Holdco breached two anti-assignment clauses found in the APA and Production Lease. Defendants do not move for summary judgment as to the other alleged breaches relating to different provisions of the agreements. Medex CP argues that these two anti-assignment clauses are narrow and do not prohibit mergers like that involving Medex CP and Smiths Medical. IPI and Walter Levine also move for summary judgment as to its claim that Medex CP breached the anti-assignment clauses of the APA and Production Lease. IPI argues that Medex CP breached the anti-assignment clauses of the APA and Production Lease by assigning the IPI business to Smiths Medical without IPI's prior written consent.

### a.      Anti-Assignment Language of APA and Production Lease

The APA contains the following "anti-assignment" clause, which applies to both IPI and Medex CP:

8.5   **No Assignment.**  Neither this Agreement nor any rights or obligations under it are assignable without the prior written consent of the other party.

(Doc. 208-10, p. 22).  The Production Lease contains two "anti-assignment" provisions, one of

which applies to IPI (the "lessor") and one of which applies to Medex CP (the "lessee").  The

provision applicable to IPI states as follows:

> **20.  ASSIGNMENT BY LESSOR [IPI].**  Lessor shall have no right to assign, pledge, transfer, mortgage or otherwise convey any of its interests hereunder or any Equipment, in whole or in part, without notice to, and consent of, Lessee.  If any such Equipment is validly assigned, Lessee shall: (a) unless otherwise specified by the Lessor and the assignee ("Assignee") specified by Lessor, pay all amounts due to such Assignee, subject to any defense, setoff or counterclaim that Lessee may have against Lessor or Assignee; (b) not permit this Lease to be amended or the terms thereof waived without the prior written consent of the Assignee; and (c) execute such acknowledgments thereto as may be requested by Lessor.  It is further agreed that: (x) each Assignee shall be entitled to all of Lessor's rights, powers, obligations and privileges under this Lease, to the extent assigned; (y) any Assignee may reassign its rights and interests under this Lease with the same force and effect as the assignment described herein; and (z) any payments received by the Assignee from Lessee with respect to the assigned portion of the Equipment shall, to the extent thereof, discharge the obligations of Lessee to Lessor with respect to this Lease.

(Doc. 208-11, p. 7).  The provision applicable to Medex CP, which was allegedly breached,

states as follows:

> **21.  ASSIGNMENT OR SUBLEASE BY LESSEE [Medex CP]**. Without [IPI's] prior written consent, [Medex CP] shall not assign this Agreement or any schedule or assign its rights in or sublet the equipment or any interest therein; provided, however, that [Medex CP] may sublease or assign all or any part of the Equipment to an affiliate or a wholly-owned subsidiary of [Medex CP] if: (a) [Medex CP] and such sublessee or assignee execute and deliver to [IPI] a writing (to be provided by [IPI]) whereby the sublessee or assignee agrees to assume joint and several liability with [Medex CP] for the full and prompt payment, observance and performance when due of all of the obligations of [Medex CP] reasonably applicable to such assigned Equipment; and (b) [IPI] consents to such sublease or assignment, which consent shall not be unreasonably withheld.  In no event, however, shall any such sublease or assignment discharge or diminish any of [Medex CP's] obligations to [IPI] under such Schedule.

(Doc. 208-11, pp. 7-8).

IPI alleges that Medex CP breached Section 8.5 of the APA and Paragraph 21 of the

Production Lease by assigning the IPI business to Smiths Medical without IPI's consent.

According to IPI, Smiths Medical acquired the assets, and leased machinery and equipment of

IPI from Medex CP in contravention of the anti-assignment provisions.  In opposition, Medex

28

CP sets forth four arguments in support of its contention that it did not violate the anti-assignment provisions.  First, Medex CP argues that the assignment clauses were drafted very narrowly and do not apply to mergers, corporate transfers, or other corporate transactions that are not considered "assignments" under the case law.  Second, Medex CP argues that most of the assets that IPI alleges were improperly assigned were not subject to the anti-assignment provisions.  Third, Medex CP argues that IPI, through the conduct of Walter and David Levine, waived or forfeited any objection they may have had under the anti-assignment provisions.  Fourth, Medex CP argues that IPI's claim of breach of the Production Lease's anti-assignment provision fails because any assignment by Medex CP could not have been material to IPI, and thus could not have been properly prevented by IPI.  The dispute over whether Medex CP breached the anti-assignment provisions centers on these issues.

### b. Applicability of Anti-Assignment Clauses and Effect of MedVest Holdings Corporation/Smiths Medical Holdco Limited Merger

By its express terms, the APA's anti-assignment provision applies only to "rights" and "obligations" under the agreement, as well as the agreement itself.  Consequently, it does not apply to purchased assets, or any other vested, nonexecutory interests under the agreement.  That is, the APA's anti-assignment provision did not restrict Medex CP's ownership interest in the purchased assets.  Therefore, the APA's anti-assignment provision does not apply to assets that Medex CP purchased from IPI, such as intellectual property.  Consequently, the anti-assignment provision of the APA does not limit Medex CP's ability to assign purchased assets, and therefore, Medex CP did not breach this agreement as a matter of law.

As it relates to the Production Lease, the anti-assignment provision contained therein that applies to Medex CP prohibits Medex CP from "assign[ing] [the] Agreement or any schedule or assign its rights in or sublet the equipment or any interest therein; provided, however, that [Medex CP] may sublease or assign all or any part of the Equipment to an affiliate or a wholly-owned subsidiary of [Medex CP] if" certain requirements are met including obtaining

IPI's consent, which cannot be unreasonably withheld, to the sublease or assignment.  (Doc. 208-11, pp. 7-8).

The Ohio Supreme Court has observed that the general rule that all contract rights may be assigned does not apply when there is "clear contractual language prohibiting assignment." *Pilkington N. Am., Inc. v. Travelers Cas. & Sur. Co.*, 861 N.E.2d 121, 128 (Ohio 2006).  Thus, anti-assignment provisions are generally permissible under Ohio law.  However, under Ohio law, an anti-assignment clause has no effect in the context of a merger because all obligations and rights are automatically conferred upon the new entity and no assignment is necessary. *Firstsource Solutions USA, Inc. v. Harvest Info, Inc.*, No. 1:09-CV-165, 2010 WL 2598205, *5 (S.D. Ohio June 24, 2010) (Dlott, J.);  *Transcontinental Ins. Co. v. SimplexGrinnell LP*, No. 3:05-CV-7012, 2006 WL 2035571 (N.D. Ohio July 18, 2006); *see* Ohio Rev. Code § 1701.82 (setting forth the effect of a merger or consolidation).  Thus, in the context of a merger, then existing obligations and rights are transferred by operation of law, not by assignment, and consequently an "anti-assignment" provision is inoperable.

As set forth above, in 2005, MedVest Holdings, the holding company that owned Medex, Inc., which in turn owned Medex CP (the separate corporate entity that acquired the IPI business in 2002), merged with a subsidiary of Smiths Holdco.  As a result of this merger, Medex CP remained a wholly owned subsidiary of Medex, Inc., which became a subsidiary of Smiths Holdco.  Medex CP remained a separate, active corporate entity after the merger.  Thus, while Medex CP did not merge with any other corporate entity, the corporate ownership structure changed after the MedVest Holdings/Smiths Holdco merger.

Medex CP asserts that the merger between MedVest Holdings and Smiths Holdco, and the resulting change in corporate control of Medex CP and the other Medex entities, did not violate the anti-assignment provisions.  Medex CP asserts that it "simply does business under the fictitious or trade names of 'Smiths Medical' and 'Smiths Medical North America' and under the direction of its new owners at the Smiths companies."  (Doc. 227, pp. 17-18).  In support, Medex

30

CP has submitted evidence that it has been doing business as Smiths Medical in Ohio after the merger between MedVest Holdings and Smiths Holdco.  Specifically, in August 2005, Medex CP filed with the Ohio Secretary of State a fictitious name registration form to register "Smiths Medical" as a fictitious name in Ohio.  The form identifies "[m]anufacturing and marketing of critical care medical products" as the nature of the business conducted by the registrant (Medex CP) under the fictitious name.  (Doc. 226-17).  Under Ohio Revised Code § 1329.01(A)(2), a "fictitious name" is defined as "a name used in business or trade that is fictitious and that the user has not registered or is not entitled to register as a trade name."  Ohio Revised Code § 1329.01(D) requires any person or entity "who does business under a fictitious name" and who has not, or cannot, register the fictitious name as a trade name,[5] to "report the use of the fictitious name" to the Ohio Secretary of State on the prescribed form.  In 2010, Medex CP registered the trade names "Smiths Medical" and "Smiths Medical North America" by filing the appropriate forms with the Ohio Secretary of State.  These forms describe the general nature of the business conduct by the registrant (Medex CP) as "[m]anufacturer distributor & development of medical devices."  (Docs. 226-19, 226-20).  Thus, Medex CP has presented evidence that it began doing business as "Smiths Medical" after the 2005 merger.

Conversely, IPI asserts that Medex CP transferred or assigned all of its rights and obligations, as it relates to IPI, to a Smiths Medical entity.  That is, IPI claims that "Smiths Medical received all or virtually all of the equipment, products, and intellectual property that Medex CP acquired from IPI."  (Doc. 228 at 9).  In support of this assertion, IPI cites various testimony relating to changes involving Medex CP and production of IPI products after the 2005 merger, including the testimony of Mr. Arena and Walter Levine.  Mr. Arena testified that, after the merger, Smiths Medical was using former assets of IPI, including intellectual property and machinery and equipment, to manufacture and market products, under the Smiths Medical brand,

---

[5] A "[t]rade name" is "a name used in business or trade to designate the business of the user and to which the user asserts a right to exclusive use."  Ohio Rev. Code § 1329.01(A)(2).

that were formerly distributed under the IPI brand.  (Arena Dep. at 222-23).  Mr. Arena also testified that he "assumed that . . . when Smiths acquired Medex it would be acquiring IPI also in that process, that all the agreements that we had in place would probably be assumed by Smiths." *Id.* at 21.  Walter Levine testified that, before he left Smiths Medical, he observed it producing products that had been IPI products, and that, in making these products, it was using intellectual property that Medex CP had acquired from IPI.  (Walter Levine Dep. at 194-96).  Walter Levine also testified that he observed Smiths Medical use a facility where IPI products had been produced.  *Id.* at 157.  Walter Levine voiced his concern about these circumstances because Smiths Medical made competing products.  Walter Levine opposed the transaction because he reasoned that Smiths Medical would only produce the IPI products it needed, and then it would produce its own product lines for the remainder of its offerings, thereby decreasing earnouts payable to IPI under the 2002 agreements.  IPI was not consulted regarding, and it did not consent to, the MedVest Holdings and Smiths Holdco merger.

IPI essentially argues that it can be inferred that Medex CP assigned rights or interests under the APA and Production Lease to a Smiths Medical entity based on the evidence that Smiths Medical was producing and marketing products formerly produced by IPI.  IPI, however, fails to acknowledge that Medex CP itself became a "Smiths Medical entity" after the 2005 merger, insofar as it was under new corporate control and was doing business as "Smiths Medical" as a result of the merger.  Thus, evidence that Medex CP was doing business as "Smiths Medical" explains why Smiths Medical was producing and marketing products formerly produced by IPI as well as using IPI's machinery, but is not evidence of an assignment.  Because IPI presents no evidence of an assignment from Medex CP to another entity, the conclusion that IPI seeks is only reached based on speculation, and speculation does not defeat a properly supported motion for summary judgment.  In so finding, it is unnecessary to address the remaining arguments of Medex CP and Smiths Medical relating to this claim.

Based on the foregoing, the Court concludes that there is no genuine issue as to whether

Medex CP breached the APA or the Production Lease by impermissibly assigning rights or interests. Accordingly, Medex CP is entitled to the requested partial summary judgment as to Count II of the Third Amended Complaint. Conversely, IPI is not entitled to summary judgment as to this claim.

### 3.    Count III of Third Amended Complaint – Successor Liability

Smiths Medical has been joined in this action under a theory of successor liability. For the reasons set forth above, there is no genuine issue of material fact as it relates to IPI's claim alleging that Medex CP breached an oral contract or that it breached the APA or Production Lease by impermissibly assigning rights or interests. Therefore, Smiths Medical is entitled to summary judgment as to these particular claims.

### 4.    Medex CP and Smiths Medicals' Counterclaims

Count I of the Counterclaims alleges that IPI breached the APA and the Production Lease, and Count IV alleges that Walter and David Levine are personally responsible for the breaches under the Guaranty that they both signed. Count II is a claim of fraudulent inducement against IPI, and Count III is a claim of fraud against IPI. IPI and Walter Levine move for summary judgment as to all of Medex CP and Smiths Medicals' counterclaims under the APA and the Guaranty. IPI and Walter Levine assert that these claims are barred by the parties' contractual limitations period. Additionally, IPI and Walter Levine assert that the fraud claims in Counts II and III of the Counterclaims are also barred by Ohio's four-year statutory limitations period for fraud. IPI does not move for summary judgment as to the claims arising under the Production Lease.

David Levine, acting *pro se*, separately moves for summary judgment as to Count IV of the Counterclaims, adopting in support the arguments set forth by Walter Levine, and asserting a few arguments of his own. In particular, he argues that statements made in documents relating to the MedVest Holdings/Smiths Holdco merger, as well as documents Medex, Inc. filed with the Securities and Exchange Commission, somehow release IPI from any liability because these

33

statements allegedly indicated that IPI had complied with all relevant agreements with Medex CP.  He also argues that he was personally released in 2005 from any obligation he had as it relates to Medex CP via a "Completion Contract" between him and "Medex GmbH," a subsidiary of Smiths Medical.

Medex CP and Smiths Medical argue that all of their counterclaims under the APA and the Guaranty are timely and that David Levine's arguments are meritless.

### a.    Contractual Limitations Period

IPI and the Levines argue that all of Counter-Plaintiffs' counterclaims under the APA and the Guaranty, including the breach of contract claims, the fraud claims, and the guaranty claims are barred by the parties' contractual limitations period.  In support, IPI and the Levines cite Sections 7.5 and 8.13 of the APA.  As allegedly applicable here, Section 7.5 of the APA states that the APA's indemnification terms "shall survive the date [of the APA, May 10, 2002] and shall remain in effect . . . for a period of five (5) years . . . or such lesser period as may be provided in Section 8.13 in respect of the particular representation or warranty alleged to have been breached[.]"  (Doc. 112-1).  Section 7.5 further states: "provided, however, that as to any matter for which a claim has been asserted in accordance with the provisions of this Agreement that is pending or unresolved at the end of any limitation period set forth in this Section, this Article 7 shall remain in effect until such matter is finally terminated or otherwise resolved by the parties and settled under this Agreement or by a court of competent jurisdiction and any amounts payable hereunder are finally determined and paid."

Section 8.13 of the APA, which is a "survival" provision, provides that all "representations and warranties of the parties contained" in the APA "shall survive the execution and delivery of [the APA] for three (3) years after [May 10, 2002]; provided, however, the representations and warranties [regarding tax and environmental matters] shall survive until one (1) year after the expiration of the applicable statutes of limitations."  *Id.*

IPI and the Levines assert that Sections 7.5 and 8.13 "read together, make clear that all of

the relevant warranties and representations would survive for three years, or until May 10, 2005." (Doc. 217, p. 19). They reason that Medex CP and Smiths Medical were required to bring their counterclaims arising under the APA and Guaranty by May 10, 2005. Medex CP and Smiths Medical argue that Section 7.5 does not apply to their direct claims against IPI and the Levines, and that Section 8.13 is a survival clause, not a limitations clause.

Under Ohio law, a contractual limitations provision that reduces the time available to bring an action on a contract is enforceable so long as it is reasonable and is stated in words that are "clear and unambiguous." *Med. Mut. of Ohio v. Amalia Enterprises, Inc.*, 548 F.3d 383, 393 (6th Cir. 2008) (citing *Angel v. Reed*, 891 N.E.2d 1179, 1181 (Ohio 2008); *Barbee v. Nationwide Mut. Ins. Co.*, 955 N.E.2d 995, 998 (Ohio 2011) ("the parties to a contract may validly limit the time for bringing an action on a contract to a period that is shorter than the general statute of limitations for a written contract, as long as the shorter period is a reasonable one."). Moreover, the Court notes that under Ohio law, "[t]he construction of written contracts . . . is a matter of law." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, paragraph one of the syllabus (Ohio 1978). When a court is confronted with an issue of contractual interpretation, the court must give effect to the intent of the parties to the agreement. *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). The court must examine a contract as a whole and presume that the intent of the parties is reflected in the language used in the contract. *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 875 N.E.2d 31, 34 (Ohio 2007) (citing *Kelly v. Med. Life Ins. Co.*, 509 N.E.2d 411, paragraph one of the syllabus (Ohio 1987)).

Section 7.5 of the APA is contained within the "Indemnification" article of the APA (Article 7). Section 7.1 of Article 7 provides in part as follows:

**Obligations of Seller [IPI]**. Seller [IPI] agrees to indemnify and hold harmless Buyer [Medex CP] . . . from and against any and all loss, claim, action, cost, damage, assessment, disbursement, expense (including, without limitation, interest, penalties and reasonable attorneys' fees (including reasonable in-house counsel fees)), liability, deficiency, diminution in value, obligation, penalty, judgment or settlement (excluding direct or indirect internal overhead expenses (except reasonable in-house counsel fees)) of any kind or nature (collectively

35

"Losses"), directly or indirectly, as a result of, or based upon or arising from:

7.1.1  Any breach of any representation, warranty or covenant of Seller made in this Agreement[.]

(Doc. 187-1, p. 18).

As it relates to the Levines, Section 7.6 of Article 7 provides:

**<u>Guaranty of Obligations</u>**.  All representations, warranties and covenants of Seller [IPI] under this Agreement and of the Landlord under the Real Property Lease are guaranteed by Walter Levine and David Levine pursuant to a Guaranty, substantially identical in form and substance to Exhibit "H" attached hereto (the "Guaranty") executed by Walter Levine and David Levine in favor of Buyer [Medex CP].

(Doc. 187-1, p. 21).

According to IPI and the Levines, the language of Section 7.5 and 8.13 demonstrates a clear intent to create a limitations period.  In support, they cite Section 7.5's reference to "the end of any limitation period set forth in this Section" and Section 8.13's language that certain "representations and warranties [regarding tax and environmental matters] shall survive until one (1) year after the expiration of the applicable statutes of limitations."  But this language does not further the argument of IPI and the Levines.  Indeed, Section 7.5 contains a limitations period, but it is a limitation on the survival of indemnification obligations, not a limitation on Medex CP's ability to sue IPI for breach of the APA.  And Section 7.5 does not place any sort of limitation on the obligations set forth in Section 7.6, even though the Levines' obligations under the Guaranty include the obligation to indemnify Medex CP from all injury, expense, or loss that may arise as a result of a breach of the APA or Production Lease.  Furthermore, Section 8.13 does not change this, as it is simply a survival clause.

In *Arcade Co. Ltd. v. Arcade, LLC*, 105 F. App'x 808 (6th Cir. Aug. 4, 2004), the Sixth Circuit was faced with the issue of whether the following language demonstrated an intent to create a contractual limitation period: "Survival. The representations, warranties, obligations, covenants, agreements, undertakings and indemnifications of the parties contained herein and in any instrument acquired to be delivered pursuant hereto shall survive the Closing for a period of

36

one (1) year." *Id.* at 810. The court ruled that this language does not demonstrate an intent to alter the otherwise applicable statute of limitations. *Id.* The *Arcade Co. Ltd.* court further observed:

> This conclusion is also supported by sound policy concerns. Statutes of limitation exist to provide finality for potential litigants. This finality is achieved by extinguishing-after a statutorily prescribed period of time-potentially valid claims. An agreement purporting to affect this finality must be made manifest in clear, unequivocal language. A survival clause such as the one at issue here, which contains no express reference to "actions," "demands," or even to breach of the contract, does not clearly manifest an intent to establish a contractual limitations period.

*Id.* at 811. As in *Arcade Co. Ltd.*, neither section cited by IPI and the Levines purports to limit any "action," "lawsuit," or "demand" made on behalf of Medex CP.

Accordingly, the Court finds that, contrary to the arguments of IPI and the Levines, the APA does not contain a contractual limitations provision that reduces the time available to bring an action on the APA or the Guaranty.

### b. Timeliness of Fraud Claims

IPI and Walter Levine argue that the fraud claims against IPI contained in the Counter-Plaintiffs' Counterclaims (Counts II and III) are barred by the four-year limitations period for fraud claims set forth in Ohio Revised Code § 2305.09. Medex CP and Smiths Medical argue that the fraud claims are timely because, based on choice of law principles, the Illinois five-year limitations period for fraud claims should apply, not the Ohio four-year limitations period.

A federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *Charash v. Oberlin Coll.*, 14 F.3d 291, 296 (6th Cir. 1994) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Under Ohio choice of law principles, statutes of limitations of the forum state are applied even if the facts of the case creating the cause of action dictate the use of other substantive law. *Charash*, 14 F.3d at 299; *Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 328 (6th Cir. 1989) ("In deciding what substantive law applies, one must first look to the forum state's choice of law statute. However, we must apply the procedural law, including statutes of limitations, of the forum state."). Furthermore, pursuant to Section 8.4 of the APA,

37

the APA, "and the legal relations between the parties, shall be governed by and construed in accordance with the laws of the state of Ohio, without regard to conflicts of law doctrines." There is no dispute between the parties that the fraud claims were filed more than four years after the accrual of the causes of action.  Applying the Ohio four-year statute of limitations, the fraud claims are time-barred.  Accordingly, IPI is entitled to summary judgment as to Counts II and III of the Counterclaims.

### c.     David Levine's Arguments

Finally, the Court will address David Levine's arguments in support of his Motion for Summary Judgment.  David Levine argues that statements made in documents relating to the MedVest Holdings/Smiths Holdco merger, as well as documents Medex, Inc. filed with the Securities and Exchange Commission, somehow release IPI from any liability to Medex CP for alleged false representations because these statements allegedly indicated that IPI had complied with all relevant agreements with Medex CP.  According to David Levine, these documents demonstrate an affirmation by Medex Holdings that parties to contracts with Medex Holdings (and its subsidiaries), such as IPI, have complied with the provisions of these contracts.  Even if these documents are admissible here, and even if they demonstrate what David Levine purports them to demonstrate, they would be potential evidence, but not conclusive evidence, in support of his position at trial.  Such evidence does not, as a matter of law, disprove Medex CP's evidence that IPI breached the 2002 agreement, or demonstrate that Medex CP waived any right to sue for breach of contract against IPI or the Levines.

As it relates to the "Completion Contract," which appears to be David Levine's employment separation agreement with Medex GmbH, he asserts that Medex GmbH "cancelled all requirements of any other agreements between Medex Inc. and Medex Cardio-Pulmonary, Inc. and David Levine."  (Doc. 218, p. 5).  The document states in Section 10, the "completion clause," as follows:

> The parties are itself over the fact united that with the fulfillment of this
> agreement all requirements of the parties from the employer-employee

38

relationship are settled.  Against the notice no objections are raised.

With completion of this agreement, no requirements of the employee will persist from any other agreement with Medex Inc. and Medex Cardio-Pulmonary, Inc.

(Doc. 215-6, Ex. 7).  This document contains both a German and English version of the contract, and appears to have been executed in Germany.  The English portion of the document contains odd phrasing and therefore it appears that the English portion is a translation of the German language used.  The document does not reference the Guaranty, and it only refers to David Levine's obligations as an "employee," in the context of the "employer-employee relationship."  David Levine's obligations under the Guaranty were as an officer of IPI, not as an employee of a Medex entity.  Thus, the separation agreement does not demonstrate an intent to release David Levine's obligations under the Guaranty.  As such, David Levine has not met his burden of demonstrating that this document released, as a matter of law, any of his obligations as a guarantor under the Guaranty.  Consequently, his request for summary judgment is denied.

## V.    Conclusion

For the foregoing reasons, the Court **OVERRULES** Medex CP's Objection to the Magistrate Judge's Discovery Order; **GRANTS** Medex CP's Motion for Leave to File Instanter Sur-reply (Doc. 219); **GRANTS** David Levine's Motion to Vacate Default Order of March 23, 2012; and **GRANTS** David Levine's Motion for Leave to File a Responsive Pleading (Doc. 206).  Therefore, the Clerk's March 23, 2012 Entry of Default as to Counter-Defendant David Levine is hereby **VACATED**.  Additionally, the Court **GRANTS** Medex CP and Smiths Medical's Motion for Partial Summary Judgment (Doc. 208); **GRANTS in part and DENIES in part** IPI and Walter Levine's Motion for Summary Judgment (Doc. 217); and **DENIES** Walter Levine's Motion for Summary Judgment (Doc. 218).

Accordingly, Medex CP and Smiths Medical are awarded summary judgment on Count I and the anti-assignment clause claims in Count II of IPI's Third Amended Complaint, and IPI is awarded summary judgment on Counts II and III of Medex CP and Smiths Medical's

Counterclaims. The following claims remain pending: Count II of the Third Amended Complaint as it relates to alleged breaches of provisions other than the anti-assignment clauses; Count III of the Third Amended Complaint, insofar as IPI claims successor liability against Smiths Medical for claims not related to the oral breach of contract claim and the alleged breach of the anti-assignment clauses; Count I of the Counterclaims; and Count IV of the Counterclaims.

The Clerk shall remove Documents 206, 208, 217, 218, and 219 from the Court's pending motions list.

**IT IS SO ORDERED.**

_s/ George C. Smith_
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**