## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is entered into as of May 10, 2002, by and between INHALATION PLASTICS, INC., an Illinois corporation ("Seller") and MEDEX CARDIO-PULMONARY, INC., an Ohio corporation ("Buyer").

## R E C I T A L S

WHEREAS, Seller owns or leases certain assets more particularly described in this Agreement used by Seller in the designing, developing, manufacturing, marketing and selling of disposable critical care devices and equipment utilized in the respiratory care, cardiopulmonary support and anesthesiology markets (the "Business");

WHEREAS, Seller leases certain real property commonly known as 3217 North Kilpatrick Avenue, Chicago, Illinois, in which the totality of its business operations are located, from a trust of which the trustee (grantor) and primary beneficiary is the owner of one hundred percent (100%) of the issued and outstanding shares of stock of Seller; and

WHEREAS, Seller desires to sell and/or lease and Buyer desires to purchase and/or lease from Seller, as appropriate, all of the assets related to the Business and lease the real estate used by Seller in the operation of its Business for the consideration and on the terms and conditions described herein.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the mutual covenants and promises contained herein and intending to be legally bound, the parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF ASSETS
## AND LEASE OF SPECIFIED ASSETS

1.1     **Purchase of Assets**. Subject to the terms and conditions of this Agreement, upon the execution hereof, Seller will sell, transfer, assign and deliver or cause to be sold, transferred, assigned and delivered, to Buyer, and Buyer will purchase from Seller, all of Seller's rights, title and interest in and to all of those assets, rights and properties, which are used in or are related to the Business or are necessary for the operation of the Business as presently conducted (the "Purchased Assets"). The Purchased Assets include, but are not limited to, the following:

1.1.1     **Inventory**. All inventory of the Business, including, but not limited to, finished goods, work-in-process and raw materials (collectively, the "Inventory"), a list of which as of even date herewith is set forth in Section 1.1.1 of the Disclosure Schedule.

1.1.2     **Real Property**. All leasehold interests relating to real property used in or related to the Business, which leasehold interests are more fully described in Section 1.1.2 of the Disclosure Schedule (the "Real Property");

1.1.3     **Accounts Receivable and Prepayments**. All accounts receivable (including, without limitation, all accounts receivable arising from sales prior to the date hereof, even if the

1



CONFIDENTIAL

MEDCP00128

invoices relating to such sales have not been issued as of the date hereof), notes receivable, prepaid items, credits, reserves and deposits paid by Seller, a list of which as of even date herewith is set forth in Section 1.1.3 of the Disclosure Schedule;

1.1.4 **Intellectual Property**. All patents, trademarks and trade names, trademark and trade name registrations, service marks and service mark registrations, copyrights and copyright registrations, the applications therefor and the licenses with respect thereto, all unregistered intellectual property, all trade secrets, secret processes, confidential information and know-how, inventions, designs and improvements, research and development work in process, and any rights or claims relating to or deriving from any of the foregoing (collectively, the "Intellectual Property") used in or related to the Business, a list of which patents, trademarks and trade names, trademark and trade name registrations, service marks and service mark registrations, copyrights registrations, applications for any of the foregoing, research and development and licenses under which Seller is entitled to use any of the foregoing as is set forth in Section 1.1.4 of the Disclosure Schedule;

1.1.5 **Sales Materials**. All of Seller's sales data and information, customer lists, supplier lists, engineering and production records, mailing lists, catalogues, brochures, sales literature, promotional material, advertising material and other selling material;

1.1.6 **Books and Records**. All books and records and all files, documents, papers and agreements (including, but not limited to, those contained in computerized storage media) pertaining to Seller's assets or liabilities or otherwise relating to the Business (excluding the capitalization and organizational documents and records of Seller, copies of which will be available to Buyer at its request) (the "Business Records"); provided, that Buyer shall for a period of five (5) years following the date hereof (as defined below) maintain such Business Records and shall, at the written request of Seller, provide to Seller or its representatives or successors at reasonable times access to and the right to make copies of such Business Records;

1.1.7 **Assigned Contracts**. All rights of Seller under all contracts, agreements, leases, licenses, sales orders, purchase orders or other legally binding commitments or instruments, whether or not in writing (collectively "Contracts"), guarantees and warranties from third parties, all as set forth in Section 3.9 of the Disclosure Schedule and those Contracts entered into in the ordinary course of the Business through the date hereof (the "Assigned Contracts"); provided, however, that the Assigned Contracts shall not include any of the Seller's loans, lines of credit or other liabilities;

1.1.8 **Insurance from Destroyed or Damaged Assets**. All insurance proceeds from any insurance provider for any Asset that is destroyed or damaged prior to the date hereof, or any replacement property or asset actually acquired for such destroyed or damaged Asset;

1.1.9 **Permits**. All transferable licenses, permits, franchises, certificates of authority or orders (and any applications therefore) and any equivalent documents (collectively "Permits") as set forth in Section 3.5 of the Disclosure Schedule; and

1.1.10 **FDA Approvals**. All approvals of the FDA or any comparable state and foreign governmental agencies, including any 510(k) clearances obtained by Seller in connection with the conduct of the Business (and any applications therefore) and any equivalent documents including, without limitation, export certificates, manufacturing facility registration numbers, and other FDA certifications (collectively "FDA Approvals") as set forth in Section 3.6 of the Disclosure Schedule;

2

CONFIDENTIAL

MEDCP00129

1.1.11  <u>Assets Not Subject to Lien</u>.  Any personal property, tangible or intangible except the Excluded Assets which is not, at the Closing, subject to the lien of a security interest or other lien claim of any of Seller's creditors.  Such assets are identified in Section 3.10 of the Disclosure Schedule; and

1.1.12  <u>Goodwill</u>.  The goodwill incident to the Business.

1.2  <u>Excluded Assets</u>.  The Purchased Assets shall not include the following:

1.2.1  <u>Consideration</u>.  The consideration delivered to Seller pursuant to this Agreement.

1.2.2  <u>Charter Documents</u>.  The Articles of Incorporation and other records having to do with the organization and capitalization of Seller; provided, however, that true copies of such records shall be provided to Buyer for review on or before the date hereof.

1.2.3  <u>Automobile</u>.  1992 Cadillac Seville.

1.2.4  <u>Receivables From Affiliates</u>.  Any accounts, notes, advances or loans receivable from Seller's affiliates, shareholders, shareholders' family members or employees.

1.2.5  <u>Leased Personal Property</u>.  All personal property currently leased by Seller, except those leases set forth in Section 1.25 of the Disclosure Schedule and which Buyer has specifically agreed to assume.

1.2.6  <u>Litigation</u>.  All claims, suits, choses in action or other litigation in which Seller and/or Seller's shareholders are plaintiff(s) or complainant(s).

1.3  <u>Lease of Tangible Personal Property</u>.  All tangible personal property, including, but not limited to machinery, equipment, fixtures, furniture, tools, supplies, molds, dies and other tangible personal property which is or may be subject to the lien of a security interest in favor of any of Seller's creditors or which, as a condition to the effectiveness of this transaction has been released from such lien of security interest(s), shall be leased by Buyer in accordance with the terms of that certain Machinery and Equipment Production Lease ("Production Lease") of even date herewith, an unsigned copy of which lease is attached hereto as Exhibit "B" and the terms of which are hereby incorporated and made a part hereof.

**ARTICLE 2**
**PURCHASE PRICE/ASSET LEASE**
**TERMS OF PAYMENT**

2.1  <u>Purchase Price/Asset Lease</u>.  The transactions contemplated hereby shall be consummated and closed upon the execution hereof, (the "Closing").  At the Closing, and upon the terms and subject to the conditions set forth herein, Buyer agrees to pay to Seller the following Purchase and lease consideration defined as the aggregate of (i) the Cash Purchase Price (as defined in Section 2.1.1), (ii) Production Lease Payments (as defined in Section 2.1.2), (iii) the Inventory Note (as defined in Section 2.1.4), and (iv) the Accounts Receivable Note (as defined in Section 2.1.5).

2.1.1  <u>Cash Purchase Price</u>.  Upon the execution hereof, Buyer agrees to acquire the Assets from Seller and pay the amount of One Hundred and Sixty-One Thousand Dollars ($161,000.00) (the "Cash Purchase Price"), in cash or immediately available funds.

3

CONFIDENTIAL

2.1.2 **Production Lease.** In addition to the Cash Purchase Price set forth above, Buyer shall pay to Seller rental payments pursuant to and as required by the terms of the Production Lease (the "Production Lease Payments") as described in Section 1.3 above.

2.1.3 **Audit of Production Lease Payments.** In addition to receipt of monthly reports of product sales and quarterly financial statements of Buyer without charge to Seller, Seller shall be entitled, at Seller's election and at Seller's expense, to review, audit or examine the books and records of Buyer ("Seller's Review") in which information related to Production Lease Payments is recorded, together with any of Buyer's records supporting its entries in those books to confirm such information, provided that Seller may review, audit or examine any particular fiscal year's records only once and such review, audit or examination of shall be completed within sixty (60) days from the date of commencement. Seller shall be entitled to audit the books and records of Buyer in respect of a fiscal year as set forth in this Section only upon thirty (30) days written notice to Buyer given at any time during the one year period following the date of the related Production Lease Payment, after which the right to dispute Production Lease Payment for such fiscal year shall have expired. Notwithstanding, any Seller's Review that has commenced and is pending according to the terms hereof prior to the end of such one year period following the date of the related Production Lease Payment shall expire only upon the withdrawal or final resolution of such claim in accordance with the terms hereof. Any such Seller's Review shall take place during the normal business hours of Buyer and at the place where those books and records are normally kept. In the event that Buyer and Seller are unable to agree on the amount due for any Production Lease Payment to be paid hereunder, Buyer shall pay to Seller that portion of the respective Production Lease Payment that is not in dispute, and only that portion of any amount alleged to be owed by Buyer to Seller shall be submitted for final resolution to the Columbus, Ohio office of PriceWaterhouseCoopers, LLP (the "Independent Accountants"); provided, however, that in the event that PriceWaterhouseCoopers, LLP acts at any time in the future as the independent auditors for Buyer or any affiliate of Buyer, then another "big five" accounting firm (to be mutually agreed upon by the parties hereto) shall act as the Independent Accountants. The Independent Accountants shall make such final determination on the basis of such procedures as the Independent Accountants, in their sole judgment, deem applicable and appropriate, taking into account the nature of the issues, the amount(s) in dispute and the respective positions asserted by the parties. The Independent Accountants shall review the disputed matters and as promptly as practicable deliver to Seller and Buyer a statement in writing setting forth their determination as to the disputed amount. Such determination shall be final and binding upon the parties without any further right of appeal. Buyer and Seller agree that a judgment of any state or federal court of competent jurisdiction may be rendered upon any determination made by the Independent Accounts pursuant to this Section. The fees and expenses of the Independent Accountants in determining the amount owed under any disputed Production Lease Payment shall be borne by Seller and Buyer proportionately as follows: Seller shall pay an amount equal to the aggregate amount of such fees and expenses, multiplied by the fraction (not to exceed 100%) (the "Proration Fraction") which results from dividing (a) the difference between the amount set forth by Seller as the appropriate Production Lease Payment and the final Production Lease Payment as determined by the Independent Accountants, by (b) the difference between the amount set forth by Buyer as the appropriate Production Lease Payment, each as submitted to the Independent Accountants, and the balance of such fees and expenses shall be paid by Buyer. In addition, if the Proration Fraction as calculated above provides that Buyer is required to pay in excess of 50% of the total fees and expenses of the Independent Accountants, then Buyer shall also reimburse Seller for the same pro rata percentage of

4

CONFIDENTIAL

MEDCP00131

the reasonable fees and expenses Seller incurred in connection with Seller's Review. If the Proration Fraction provides that Buyer is required to pay 50% or less of the total fees and expenses of the Independent Accountants, then Buyer is not required to reimburse any of Seller's fees and expenses incurred in connection with Seller's Review. If the Proration Fraction provides that Seller is required to pay in excess of 50% of the total fees and expenses of the Independent Accountants, then Seller shall reimburse Buyer for the same pro rata percentage of any reasonable fees and expenses incurred by Buyer in connection with the preparation of any records or documentation relating to Seller's Review and the review by the Independent Accountants. If the Proration Fraction provides that Seller is required to pay 50% or less of the total fees and expenses of the Independent Accountants, then Seller is not required to reimburse any of the fees and expenses incurred by Buyer in connection with the preparation of any records of documentation relating to Seller's Review and the review by the Independent Accountants.

2.1.4   **Inventory Note.** At the Closing, Buyer shall deliver to Seller, the Inventory Note, substantially identical in form and substance to Exhibit "C" attached hereto (the "Inventory Note") which Inventory Note shall bear no interest and shall be in such principal amount as shall be determined under the terms thereof, and which Inventory Note shall further provide that funds payable thereunder to IPI are to be disbursed by Buyer, as agent for IPI, to IPI's creditors in accordance with the provision of Section 7.1.5 hereof.

2.1.5   **Accounts Receivable Note.** At the Closing, Buyer shall deliver to Seller Buyer's Accounts Receivable Note, substantially identical in form and substance to Exhibit "D" attached hereto (the "Accounts Receivable Note") which Accounts Receivable Note shall bear no interest and shall be in such principal amount as shall be determined under the terms thereof, and which Accounts Receivable Note shall further provide that funds payable thereunder to IPI are to be disbursed by Buyer, as agent for IPI, to IPI's creditors in accordance with the provisions of Section 7.1.5 hereof.

2.2   **Instruments of Conveyance and Transfer.** At the closing, Seller shall execute and deliver or cause to be delivered to Buyer (a) the Bill of Sale, substantially identical to that attached hereto as Exhibit "A" (the "Bill of Sale"); (b) the Production Lease; (c) the Inventory Note; (d) the Accounts Receivable Note; and (e) such other documents as may be reasonably requested by Buyer in order to carry out the transactions contemplated hereby, including without limitation those documents embodied in the unsigned copies of same attached hereto as Exhibits "E", "F", "G", "H" and "I".

2.3   **Non-Assumption of Liabilities.** Notwithstanding anything to the contrary in this Agreement, Buyer is not assuming, and shall not be deemed to have assumed any liabilities or obligations of Seller or the Business or otherwise, of any kind of nature (whether actual or contingent, matured or unmatured, liquidated or unliquidated, or known or unknown and whether arising before or after the date hereof and whether or not disclosed on the Balance Sheet (as defined in Section 3.7.1), including, but not limited to the following (i) any liability or obligation of Seller incurred on behalf of or owed to any stockholder or affiliate of Seller; (ii) all liabilities and obligations of the type described in Section 7.1.2; (iii) any liabilities, liens, or incumbances relating to the Banco Popular Loans or Line of Credit; and (iv) all other liabilities or obligations of any kind or nature of Seller or the Business, including without limitation, those liabilities described in Section 7.1.5 herein.

2.4   **Tax Allocation.** Buyer and Seller shall allocate the Purchase Price to broad categories constituting components of the Assets in accordance with the basis of allocation set forth in

5

CONFIDENTIAL

Section 2.4 of the Disclosure Schedule. Each party will report the transactions contemplated in this Agreement in accordance with the agreed upon allocation for all federal, state, local and other tax purposes. Each party further agrees to cooperate in the preparation of Form 8594 under Section 160 of the Internal Revenue Code of 1986, as amended, or as may hereafter be amended (the "Code"), and the timely filing of such Form with the Internal Revenue Service,

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller has delivered to Buyer a Disclosure Schedule (the "Disclosure Schedule") which qualifies the representations, warranties and agreements made in this Article 3 to the extent expressly provided herein.

3.1 **Organization, Power and Authority**. Seller is a corporation duly organized, validly existing and in good standing under the laws of Illinois. Seller does not own or lease any real property or maintain any place of business outside of Illinois and is not qualified to do business in any other jurisdiction. Seller has all requisite power and authority to own, operate and lease the Purchased Assets, to conduct the Business, to execute and deliver this Agreement and the related documents contemplated hereby and to perform its obligations hereunder and thereunder.

3.2 **Authorization of Agreements**. The execution, delivery and performance by Seller of this Agreement and the related documents contemplated herein, and the consummation by it of the transactions contemplated herein and therein, have been duly authorized by all necessary action by Seller. This Agreement and each of the related documents have been duly executed and delivered by Seller and constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally, and by equitable principles.

3.3 **No Breach**. The execution and delivery of this Agreement and the related documents by Seller do not, and the consummation of the transactions contemplated hereby and thereby will not (a) violate any provision of the charter documents or bylaws of Seller; (b) result in the breach (or an event which, with the giving of notice or lapse of time or both, would constitute a breach) of any term or provision of, or constitute a default under, or give rise to a right to terminate, any material indenture, mortgage, deed of trust or other agreement or arrangement to which Seller is a party or by which any of the Assets are bound or affected; (c) result in the creation of any lien, charge or encumbrance on the Assets; or (d) violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority to which Seller is subject or by which any of the Assets are bound or affected.

3.4 **Governmental Approvals, Consents**. No approval, authorization, consent, qualification, order or registration, or any waiver of any of the foregoing, or any action of, or any notice, statement or other communication is required to be filed with or delivered to, any governmental entity or any other person for the execution and delivery by Seller of this Agreement or the related documents or the consummation by it of the transactions contemplated herein or therein.

3.5 **Permits**. Section 3.5 of the Disclosure Schedule sets forth each Permit, or any waiver thereof, obtained by Seller, that is required to be issued by any governmental entity or obtained by Seller in connection with the conduct of the Business (other than Permits the failure to obtain which could not reasonably be expected to have a material adverse effect on the Business) together with the name of the governmental entity issuing such Permit. Except as set forth in Section 3.5 of the Disclosure Schedule, such Permits are valid and in full force and effect, all such Permits are

6

CONFIDENTIAL

MEDCP00133

freely transferable by Seller, and as of the date hereof, Buyer will have all right, title and interest as the holder thereof. To the best of Seller's knowledge, no suspension, cancellation or termination of any Permit required by any governmental entity to permit the Business to be conducted is threatened that could reasonably be expected to have a material adverse effect on the Business.

3.6     **FDA Approvals.** Section 3.6 of the Disclosure Schedule sets forth all FDA clearances to market with respect to the products sold or proposed to be sold by Seller in connection with the conduct of the Business. Except as set forth in Section 3.6 of the Disclosure Schedule, such FDA clearances to market effectively satisfy all mandatory procedures and safety and efficacy requirements established by the FDA or any comparable state and foreign governmental agencies and are the only FDA clearances to market necessary to conduct the Business as currently constituted. Such FDA clearances to market are valid and in full force and effect, all such FDA clearances to market are freely transferable by Seller, and as of the date hereof, Buyer will have all right, title and interest as the holder thereof. To the best of Seller's knowledge, no suspension, cancellation or termination of any FDA clearances to market is threatened that could reasonably be expected to have a material adverse effect on the Business.

3.7     **Financial Statements; Changes.**

3.7.1     **Unaudited Financial Statements.** Seller has delivered to Buyer a balance sheet for Seller at December 31, 1999, December 31, 2000 and December 31, 2001 (the "Balance Sheets"), and the related statements of income and retained earnings (deficit) and of cash flows for the periods then ended (collectively, the "Financial Statements"). All such Financial Statements have been prepared in accordance with generally accepted accounting principles and based upon the books and records of Seller on a basis consistent with past practice. The statements of operations and cash flows present fairly the results of income and cash flows of Seller for the period covered, and the Balance Sheets present fairly the financial position of Seller as of December 31, 2001 and of the two (2) years preceding 2001.

3.7.2     **No Material Adverse Changes.** Except as set forth below and in Section 3.7.2 of the Disclosure Schedule, since the date of the December 31, 2001 Balance Sheet, whether or not in the ordinary course of the Business, there has not been, occurred or arisen:

   (a)     any change in or event affecting Seller or the Business that has had or may reasonably be expected to have a material adverse effect on Seller, the Purchased Assets, the assets subject to the Production Lease, or the Business (including its results of operations, financial position and prospects);

   (b)     any transaction entered into or carried out other than in the usual and ordinary course of the Business based on the Business' past practice;

   (c)     any material change made in the methods of doing business or in the accounting principles or practices or the method of application of such principles or practices; or

   (d)     any sale, lease or other disposition of, or any agreement to sell, lease or otherwise dispose of, any of the Purchased Assets, or the assets subject to the Production Lease, other than sales, leases or other dispositions in the usual and ordinary course of the Business consistent with the Business' past practice.

7

CONFIDENTIAL

MEDCP00134

Notwithstanding the above, all cash proceeds received by Seller since December 31, 2001 have been applied towards the payment of either usual and reasonable operating expense or outstanding accounts payable of the Business or the outstanding principal balance and accrued interest of the Banco Popular Loans or Line of Credit.

3.8    <u>Tax Matters</u>.

    3.8.1    <u>Tax Filings</u>.  Seller has timely filed or will timely file all tax returns required of it and has paid or will pay all taxes of Seller due for all periods or portions of periods ending on or before the date hereof (except as provided in the following sentence).  Adequate provision has been made in the books and records of Seller, and in the Financial Statements, for all taxes of Seller whether or not due and payable and whether or not disputed to the extent not paid, including penalties and interest assessed or assessable thereupon.

    3.8.2    <u>Tax Audits</u>.  No governmental entity has, during the past three (3) years, examined or is in the process of examining any tax returns of Seller.  Except as set forth in Section 3.8.2 of the Disclosure Schedule, no governmental entity has proposed in writing any deficiency, assessment or claim for taxes and, there is no basis for any such deficiency, assessment or claim against Seller or its shareholder(s).  No waiver of the statute of limitations with respect to tax returns of Seller has been given by or requested from Seller.

3.9    <u>Obligations and Indebtedness</u>.

    3.9.1    Section 3.9 of the Disclosure Schedule lists each Contract to which Seller is a party or to which Seller or the Assets is subject or by which Seller or the Assets is bound that individually, or together as a series of related Contracts involving the same party or parties, or the successors to such party or parties: (a) obligates Seller to pay an amount of $5,000 or more; (b) has an unexpired term as of the date of the Balance Sheet in excess of six (6) months; (c) provides for an extension of credit by Seller to any customer or client of Seller for any amount over $25,000; (d) provides for the borrowing of money by Seller other than credit agreements with banks having normal credit terms; (e) was not made in the ordinary course of the Business; or (f) is in any way otherwise material to the Business.  Each Contract is valid and existing, Seller has duly performed all its obligations thereunder to the extent that such obligations to perform have accrued and no breach or default, alleged breach or default, or event which would (with the passage of time, notice or both) constitute a breach or default thereunder by Seller, or, to the best knowledge of Seller, any other party or obligor with respect thereto, has occurred or as a result of the transactions contemplated herein will occur.  True copies of the Contracts listed in Section 3.9 of the Disclosure Schedule, including all amendments and supplements thereto, have been delivered to Buyer.

    3.9.2    <u>Indebtedness</u>.  Schedule 3.9.2 of the Disclosure Schedule sets forth all indebtedness of Seller as at December 31, 2001 and updated as at the date of Closing including but not limited to:

        (a)    Loans payable to Banco Popular, including a Small Business Administration ("SBA") guaranteed loan;

        (b)    Extensions of credit pursuant to a Line of Credit Loan payable to Banco Popular;

8

CONFIDENTIAL

MEDCP00135

     (c)    Loans secured by the Real Property .made to Seller's principal, Walter Levine or to the Merrimac Trust of which Trust Walter Levine and his family members are beneficiaries;

     (d)    All trade accounts payable listed by creditor;

     (e)    All accounts due employees or consultants for salaries and wages, vacation pay, severance or other benefits payable including payments to retirement or deferred compensation plans, detailed as to each employee;

     (f)    All tax liabilities including interest and/or penalties; and

     (g)    All other debt of Seller, listed by creditor.

3.10   **Condition of Property, Title to Assets.** Seller has good and marketable title to all of the Assets, free of encumbrances, except for (a) liens for taxes and installments of special assessments not yet due; (b) imperfections in title, if any, not material in amount, and which individually and in the aggregate do not materially interfere with the conduct of the Business or the use of the Assets; and (c) the matters set forth in Section 3.10 of the Disclosure Schedule. All of the Assets are in good operating condition and repair as required for their use in the Business. The Assets transferred pursuant to this Agreement include all the assets used or required to conduct the Business as it is presently conducted.

3.11   **Use of Real Property.** The Real Property includes all leasehold interests currently used by Seller for the conduct of the Business. Seller owns no interest in any real property other than the leasehold interests set forth in Section 1.1.2 of the Disclosure Schedule. Seller has not received notice of any violation of any applicable zoning or building regulation or ordinance relating to the Real Property and, to the knowledge of Seller, there is no such violation. To the knowledge of Seller, no fact or condition exists which is reasonably likely to result in discontinuation of presently available or otherwise necessary water, sewer, gas, electricity, telephone, drainage facilities and other utilities or services for the Real Property. Seller has not received notice of any proposed material special assessments, or any proposed material changes in zoning or land use laws affecting any portion of the Real Property. Any lease agreement by Seller concerning the Real Property shall be terminated at the Closing Date, by agreement between Seller and Seller's Landlord.

3.12   **Legal and Regulatory Proceedings and Claims.** Except as set forth in Section 3.12 of the Disclosure Schedule, there is no order, action, investigation, inquiry or audit pending, or, to the best knowledge of Seller, threatened, against or affecting Seller, the Assets or the Business. Section 3.12 of the Disclosure Schedule lists each pending order, action, investigation, inquiry or audit of which Seller has knowledge that involves a claim or potential claim of aggregate liability in excess of $5,000 against, or that enjoins or seeks to enjoin any activity of or by Seller. Except as set forth in Section 3.12 of the Disclosure Schedule (which separately categorizes the claims of product liability and warranty), no product warranty, product liability or other tort claims are pending as of the date hereof or, to the best knowledge of Seller, threatened against Seller.

3.13   **Dividends and Other Distributions.** Except as set forth in Section 3.13 of the Disclosure Schedule, there has been no dividend or other distribution of assets or securities whether consisting of money, property or any other thing of value, declared, issued or paid by Seller subsequent to the date of the Balance Sheet dated as at December 31, 2001.

3.14   **Insurance.** Section 3.14 of the Disclosure Schedule lists all insurance policies and bonds for the Business during the past three (3) years. Seller is not in default under any such policy or bond

9

and has received no notice of cancellation of any such policy or bond. All insurance policies and bonds are, and for the past three (3) years have been, in full force and effect.

3.15    **Compliance with Law.** Seller has conducted the Business and operated and used the Assets in accordance with all federal, state and local laws and regulations applicable to the conduct of the Business, and is not in violation of any such laws other than violations which would not have a material adverse effect on the Assets taken as a whole, or on the Business.

3.16    **Employee Benefits.**

   3.16.1    **Employee Benefit Plans, Collective Bargaining and Employee Agreements and Similar Arrangements**

   (a)    Section 3.16 of the Disclosure Schedule lists all employee benefit plans and collective bargaining, employment, vacation, sick pay, or severance agreements and other similar fringe benefit plans and arrangements, including without limitation, any "employee benefit plan" (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") which provide benefits or compensation to current employees of Seller employed in the Business or which currently provides benefits or compensation to former employees of Seller who were employed in the Business.

   (b)    Seller has delivered to Buyer true and complete copies of all documents and summary plan descriptions with respect to such plans, agreements and arrangements, or summary descriptions of any such plans, agreements or arrangements not otherwise in writing.

   (c)    There are no negotiations, demands or proposals that are pending or have been made which concern matters now covered, or that would be covered, by plans, agreements or arrangements of the type described in this Section.

   (d)    Seller is in full compliance with the applicable provisions of ERISA (as amended through the date of this Agreement), the regulations and published authorities thereunder, and all other laws applicable with respect to all such employee benefit plans, agreements and arrangements. Seller has performed all of its obligations under all such plans, agreements and arrangements and all such plans, agreements and arrangements have been operated in compliance with their terms. To the best knowledge of Seller, there are no actions (other than routine claims for benefits) pending or threatened against such plans or their assets, or arising out of such plans, agreements or arrangements, and, to the best knowledge of Seller, no facts exist which could give rise to any such actions.

   (e)    All obligations of Seller under each such plan, agreement and arrangement (x) that are due prior to the date hereof have been paid or will be paid prior to that time and (y) that have accrued prior to the date hereof have been or will be paid or properly accrued on the Balance Sheet.

   3.16.2    **Qualified Plans.** No Plan listed in Section 3.16 of the Disclosure Schedule is a stock bonus, pension or profit-sharing plan within the meaning of Section 4.01(a) of the Code.

   3.16.3    **Title IV Plans.** No Plan listed in Section 3.16 of the Disclosure Schedule is a plan subject to Title IV of ERISA.

10

CONFIDENTIAL

MEDCP00137

3.16.4 **Multi-employer Plans.** No plan listed in Section 3.16 of the Disclosure Schedule is a "multi-employer plan" (within the meaning of Section 3(37) of ERISA). Seller has never contributed to or had an obligation to contribute to any multi-employer plan.

3.17 **Employee Information.** Section 3.17 of the Disclosure Schedule sets forth a list of the names, dates of hire, and current salary or wage rates of the employees of the Business employed as of the date hereof, and the names and compensation arrangements with any consultants or agents. None of such employees belongs to any union or collective bargaining unit. Seller is not under any obligation to recognize or bargain with any labor union with respect to such employees. Upon termination of the employment of any such employees by Seller, Buyer will not, by reason of anything done by Seller prior to or at the date hereof, be liable to any of said employees for so-called "severance pay" or other similar payments. Except as set forth in Section 3.17 of the Disclosure Schedule, there are no pending or to Seller's knowledge threatened employment claims or suits under applicable federal or state fair employment laws (including claims arising under workers' compensation laws) relating to or arising out of the conduct of the Business. All of Seller's employees are United States citizens or lawfully immigrated resident aliens.

3.18 **Accounts Receivable.** Except as set forth in Section 3.18 of the Disclosure Schedule, the accounts receivable reflected on the Balance Sheet dated as at December 31, 2001, and all accounts receivable arising between the date of the Balance Sheet and the date hereof, arose or will arise from transactions in the ordinary course of the Business, are collectible in the aggregate amount recorded net of the aggregate amount of any applicable reserves (which reserves are, and in the case of reserves established by Seller with respect to accounts receivable arising between the date of the Balance Sheet and the date hereof, will be, adequate), and the goods involved have been sold and delivered to the obligor, or are in transit, and no further goods or services are required to be provided in order to complete the sales and to entitle Seller or its assignee to collect the accounts receivable in full. Except as set forth in Section 3.18 of the Disclosure Schedule, no receivable has been pledged or assigned to any other person and no defense or set off to any receivable has been asserted in writing by the receivable obligor, or, to the knowledge of Seller, exists in any form.

3.19 **Inventory.** The inventory set forth on the Balance Sheet dated as at December 31, 2001 is (i) valued at the actual cost or market, if less, and (ii) consists of items of a quality and quantity currently useable and salable in the ordinary course of the Business without markdown or discount. Seller does not hold any materials on consignment and does not have title to any materials in the possession of others.

3.20 **Environmental Matters.**

3.20.1 **Definitions.** For purposes of this Agreement, the following terms shall have the meanings set forth below:

(a) "Hazardous Substance" shall mean substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws as "hazardous substances", "hazardous materials", "hazardous wastes", or "toxic substances", or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, radioactivity, carcinogenicity, reproductive toxicity or "EP toxicity", and petroleum and drilling fluids, produced waters and other wastes associated with the exploration, development or production of crude oil, natural gas or geothermal energy.

(b) "Environmental Laws" shall mean all laws relating to the protection of human health, safety or the environment including (i) all requirements pertaining to

11

CONFIDENTIAL

MEDCP00138

reporting, licensing, permitting, controlling, investigating or remediating emissions, discharges, releases or threatened releases of Hazardous Substances into the air, surface water, groundwater or land, or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Substances; and (ii) all requirements pertaining to the protection of the health and safety of employees or the public.

(c)  "Environmental Condition" shall mean the presence in, on, under or about the Real Property or the Assets of any Hazardous Substance which, if the presence of such Hazardous Substance was known, would be reportable under any Environmental Law, or which could reasonably be anticipated to require investigation or remediation pursuant to any Environmental Law.

3.20.2  **Environmental Information.**  To the best of Seller's knowledge, Seller has, prior to the date of this Agreement, provided Buyer all information which relates to the use of Hazardous Substances upon the Real Property or in the operation of the Business, any Environmental Condition existing upon the Real Property, or to the compliance of the Business or the Real Property with any Environmental Laws, except for information that discloses a use of Hazardous Substances, the existence of an Environmental Condition or a noncompliance with Environmental laws which would not have a material adverse effect on the Assets or on the Business.

3.20.3  **Compliance with Environmental Laws; Permits.**  The Business is, and at all times in the past has been, operated in all material respects in compliance with all Environmental Laws. Seller has obtained and presently maintains all Permits or other governmental authorizations required to operate the Business in all material respects in compliance with all applicable Environmental Laws.

3.20.4  **Environmental Conditions; Action by Governmental Agency.**  No Environmental Condition exists upon the Real Property and no investigation, inquiry or other proceeding is pending or, to the knowledge of Seller, threatened by any entity, person or governmental entity with respect to the Real Property or the Business and relating to any actual or alleged Environmental Condition or failure to comply with any applicable Environmental Law that could reasonably be expected to have a material adverse effect on the Business.

3.20.5  **Treatment, Storage or Disposal Sites.**  Seller has not sent Hazardous Substances to a waste treatment, storage or disposal site (an "Off-Site Facility").

3.21  **Intellectual Property.**  Section 1.1.4 of the Disclosure Schedule lists all Intellectual Property of the Business. Seller has complete rights to and ownership of all Intellectual Property it makes use of or is required to use in connection with the Business. Seller does not use any Intellectual Property by consent of any other person and is not required to and does not make any payments to others with respect thereto. The Intellectual Property of Seller is fully assignable to Buyer free and clear of any encumbrances. To Seller's knowledge, the Intellectual Property or any use by Seller of any such Intellectual Property does not conflict with or infringe (or allegedly conflict with or infringe) the rights of any person or entity. Notwithstanding the generality of the foregoing, to Seller's knowledge, none of the products of the Business conflict with or infringe (or allegedly conflict with or infringe) the rights of any person or entity with respect to the ownership, manufacturing process, design, sales or otherwise of such products or the use of the related technology.

12

CONFIDENTIAL

MEDCP00139

3.22  **Defective or Recalled Product; Product Claims.** Section 3.22 of the Disclosure Schedule sets forth in complete and adequate detail, all claims relating to use of Seller's products or defects in such products received by Seller in the preceding three (3) years and the current status or disposition thereof. Seller is aware of no other pending or potential claims or facts which may give rise to claims of defect of any of Seller's products or which may or could reasonably give rise to a belief that any of Seller's products are subject to recall or prohibition of sale thereof anywhere in the world.

3.23  **Access to Information.** To and including the Closing Date, Seller has afforded to Buyer and its agents reasonable access to its books of account, financial, tax and other records, information, employees and auditors to the extent requested by Buyer in connection with Buyer's due diligence investigation, prior to the Closing relating to the Business and/or its shareholders and affiliates; that any such access by Buyer has not unreasonably interfered with the conduct of the Business of Seller. Seller has or shall bear all of its (but not Buyer's) out-of-pocket costs and expenses reasonably incurred in connection with the foregoing.

3.24  **Conduct of the Seller Prior to Closing.** Except as set forth in Section 3.24 of the Disclosure Schedule, from December 31, 2001 until the Closing Date, Seller has conducted its businesses in the ordinary course consistent with past practice. Without limiting the generality of the foregoing, until the Closing Date, Seller represents and warrants that, without the consent of Buyer, it has not:

(a)  made any capital expenditure, or group of related capital expenditures, in excess of $10,000 in the aggregate;

(b)  failed to maintain at least $1,000,000 in single limit ($2,000,000 aggregate) in products liability insurance, and appropriate levels of general liability, consulting and workers compensation insurance as required by Seller's lenders, landlord or by operation of law;

(c)  failed to pay any trade payables or other obligations of Seller, which in the ordinary course are paid by Seller.

(d)  Modified or amended any of its currently outstanding loans or lines of credit; or

(e)  Agree or commit to do any of the foregoing.

3.25  **No Brokers or Finders.** No agent, broker, finder, or investment or commercial banker, or other person or firm engaged by or acting on behalf of Seller in connection with the negotiation, execution or performance of this Agreement and the related documents, is or will be entitled to any broker's or finder's or similar fees or other commissions as a result of this Agreement or the transactions contemplated herein.

3.26  **Bulk Sales Act.** The transactions contemplated by this Agreement, including the sale of the Purchased Assets, are not subject to, and will not subject Buyer and/or the Purchased Assets to liability under, Section 902(d) of the Illinois Income tax Act or Section 5j of the Retailers' Occupation Tax Act (collectively, the "Bulk Sales Act").

13

CONFIDENTIAL

MEDCP00140

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents, warrants and agrees as follows:

4.1 <u>Organization, Corporate Power and Authority</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the state of Ohio and has all requisite corporate power and authority to execute and deliver this Agreement and the related documents to which it is a party and to perform its obligations hereunder and thereunder.

4.2 <u>Authorization of Agreement</u>. The execution, delivery and performance by Buyer of this Agreement and the related documents contemplated herein, and the consummation by it of the transactions contemplated herein and therein, have been duly authorized by all necessary corporate action by Buyer. This Agreement has been, and each of the related documents will be as of the execution of this Agreement, duly executed and delivered by Buyer and constitute, or will, when delivered, constitute, the legal, valid and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws relating to or limiting creditors' rights generally and by equitable principles.

4.3 <u>No Breach</u>. The execution, delivery and performance by Buyer of this Agreement and the related documents to which it is a party, and the consummation of the transactions contemplated thereby will not (a) violate any provision of the charter documents or bylaws of Buyer; (b) result in the breach (or an event which, with the giving of notice or lapse of time or both, would constitute a breach) of any term or provision of, or constitute a default under, or give rise to a right to terminate, any material indenture, mortgage, deed of trust, loan, or other agreement or arrangement to which Buyer is a party or by which any of its assets are bound or affected; or (c) violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority to which Buyer is subject or by which any of Buyer's assets are bound or affected.

4.4 <u>Governmental Approvals, Consents</u>. No approval, authorization, consent, qualification, order or registration, or any waiver of any of the foregoing, or any action of, or any notice, statement or other communication is required to be filed with or delivered to, any governmental entity or any other person for the execution and delivery by Buyer of this Agreement and the related documents contemplated herein or the consummation by it of the transactions contemplated herein and therein.

4.5 <u>No Brokers or Finders</u>. No agent, broker, finder, or investment or commercial banker, or other person or firm engaged by or acting on behalf of Buyer in connection with the negotiation, execution or performance of this Agreement and the related documents, is or will be entitled to any broker's or finder's or similar fees or other commissions as a result of this Agreement or the transactions contemplated herein.

## ARTICLE 5
## COVENANTS

5.1 <u>Seller's Covenant Not to Compete</u>.

5.1.1 <u>Restrictions</u>. Seller agrees that for a period of ten (10) years after the date hereof, Seller shall not, in any way, directly or indirectly, compete with, assist any person in competing with or acquire an interest in any person and/or company competing with, the Business,

14

CONFIDENTIAL

MEDCP00141

whether as an owner, stockholder, joint venturer, partner, officer, employee, consultant, agent or otherwise anywhere in the world. It is understood by the parties hereto that this covenant not to compete applies to Seller only, and not to Walter Levine and/or David Levine individually.

5.1.2 **Special Remedies and Enforcement.** Seller and Buyer agree that a breach by Seller of any of the covenants set forth in this Section 5.1 could cause irreparable harm to Buyer, that Buyer's remedies at law in the event of such breach would be inadequate, and that, accordingly, in the event of such breach, a restraining order or injunction or both may be issued against Seller, in addition to any other rights and remedies that are available to Buyer. In connection with any such action or proceeding for injunctive relief, Seller hereby waives the claim or defense that a remedy at law is adequate, agrees to have each provision of this Section 5.1 specifically enforced against Seller and consents to the entry of injunctive relief against Seller enforcing or restraining any breach or threatened breach of this Section 5.1.

5.1.3 **Severability.** If this Section 5.1 is more restrictive than permitted by the laws of any jurisdiction in which Buyer seeks enforcement hereof, this Section 5.1 shall be construed as a series of separate covenants, one for each county, city, state and country in which the Business has been carried on or in which Buyer may conduct a similar business after the date hereof. Except for geographic coverage, each such separate covenant shall be deemed identical in terms. If, in any proceeding, a court or arbitrator shall refuse to enforce any of the separate covenants, then such unenforceable covenant shall be deemed eliminated from this Section 5.1 for the purpose of those proceedings to the extent necessary to permit the remaining separate covenants to be enforced. If the provisions of this Section 5.1 shall ever be deemed to exceed the duration or geographic limitations or scope permitted by applicable law, then such provisions shall be reformed to the maximum time or geographic limitations in scope, as the case may be, permitted by applicable law.

5.2 **Employees.** At the Closing, Seller shall terminate the employment of all of the employees of Seller. Buyer agrees to offer employment to all of the employees of Seller who are specified on Section 5.2 of the Disclosure Schedule. In conjunction therewith, Seller shall, to the extent permitted by law, provide Buyer with the personnel files of all or so many of Seller's employees as Buyer may reasonably request. The terms of Buyer's offers of employment shall be determined in the sole discretion of Buyer. Seller agrees to cooperate with Buyer by permitting Buyer throughout the period prior to the date hereof to meet with the employees of the Business at reasonable times and to distribute to them such forms and other documents relating to potential employment by Buyer after the date hereof as Buyer deems appropriate. Nothing herein shall be deemed to require Buyer to retain any of the employees of Seller or to retain any of the employees of Seller it hires for any specific period of time or to maintain compensation rates or fringe benefit programs for any specific period of time, however, Buyer shall be responsible for all actions taken or omitted to be taken with respect to such employees following their hiring by Buyer. Notwithstanding anything to the contrary in this Agreement, Buyer does not assume, and shall not be deemed to have assumed, any liability or obligation relating to or arising from the termination of any employee on or prior to the date hereof or pursuant hereto or in connection with any employee benefit plan of Seller. Seller acknowledges and agrees that it shall retain and be solely responsible for any and all liabilities, claims and expenses with respect to compensation or employee benefits of any nature owed to any employee or former employee of Seller (or the beneficiary of any such employee or former employee of Seller) that arises out of or is related to the employment relationship between Seller and any such employee or former employee prior to the date hereof. Seller shall timely provide all notices required to be provided to any of Seller's employees, former employees, or the beneficiaries or dependents of such employees or former

15

employees, under Part 6 of Subtitle B of Title I of ERISA or Section 4980B(f) of the Code (herein collectively referred to as "COBRA"), to the extent such notices are required to be provided by Seller by reason of events occurring prior to or on the date hereof or by reason of the transactions contemplated by this Agreement. For the purposes of the foregoing, Seller shall treat any employee who accepts employment with Buyer after the date hereof ("Transferred Employees") and such employee's beneficiaries and dependents, as of the date hereof, as having incurred a "qualifying event" (within the meaning of ERISA Section 603 and code Section 4980(f)(3)) as of the date hereof. Seller shall also be solely responsible for any and all liabilities, costs, expenses and sanctions resulting from any failure to comply with the Worker Adjustment and Retraining Notification Act, and the regulations thereunder ("WARN Act") in connection with the consummation of the transactions contemplated hereby.

5.3     Taxes and Other Charges.

   (a)     Buyer and Seller shall cooperate in preparing and filing tax returns relating to all sales, excise, use, or license tax due with regard to the transactions contemplated by this Agreement, except as provided in subsection (b) herein. Buyer and Seller shall each be responsible for and pay for one-half (1/2) of all of such taxes resulting from the purchase, sale, lease or transfer of the Assets hereunder.

   (b)     Seller shall file with the Illinois Department of Revenue (the "Revenue Department") all necessary returns and notices required under the Bulk Sales Acts with respect to the transactions contemplated by this Agreement. Seller shall deliver to Buyer evidence reasonably satisfactory to Buyer that the transactions contemplated by this Agreement are not subject to, and do not subject Buyer to liability under the Bulk Sales Act. If any liability under the Bulk Sales Act is assessed in connection with the transactions contemplated by this Agreement, Seller shall promptly notify Purchaser and shall within 10 days of notice of such assessment, make all payments to the Revenue Department or arrange a schedule of payments satisfactory to Buyer in all respects.

5.4     Preservation of Confidentiality. For a period of ten (10) years from the date of this Agreement, Seller agrees to treat all Confidential Information (as defined below) of Seller or the Business, as confidential, to preserve the confidentiality thereof and to not disclose any Confidential Information, except disclosures made to customers and vendors in the ordinary course of the Business through the date hereof and the disclosure to its representatives who need to know such confidential information in connection with the transactions contemplated herein at any time before or after the date hereof. Seller shall use all reasonable efforts to cause its customers, vendors and representatives to treat all Confidential Information as confidential in accordance with this Section, to preserve the confidentiality thereof and to not disclose any Confidential Information at any time before or after the date hereof. As used in this Agreement, "Confidential Information" means any and all technical, manufacturing or marketing information, ideas, methods, developments, inventions, improvements, business plans, trade secrets, scientific or statistical data, diagrams, drawings, specifications or other proprietary information relating thereto normally treated as confidential and proprietary by Seller in the ordinary course of the Business consistent with past practice, together with all analyses, compilations, studies or other documents, records or data prepared by Seller or Buyer or their respective representatives, as the case may be, which contain or otherwise reflect or are generated from such information, or which are generated in connection with the transactions contemplated herein at any time before or after the date hereof.

5.5     Accounts Receivable, Payables and Returns. Seller agrees to treat all accounts receivable, accounts payable and product warranty returns to Seller in a commercially reasonable manner

16

MEDCP00143

consistent with past practice. All sums received by Seller on account of an accounts receivable shall be immediately remitted to Buyer.

5.6    <u>Post-Closing Operation of Business.</u> The Seller acknowledges and agrees that following the Closing, Buyer shall operate the Business in sole discretion and without obligation to develop or market any particular products or components for the benefit of the Seller. Seller further acknowledges that Buyer has advised Seller that Buyer may not and will not accept for production and sale, certain of Seller's proposed new products as well as possibly limiting or eliminating production and sale of current products.

## ARTICLE 6
## DELIVERIES AT CLOSING

6.1    <u>Deliveries at Closing.</u> At the Closing, the parties shall deliver the following as set forth below:

6.1.1    <u>Cash Purchase Price.</u> Buyer shall deliver to Seller the Cash Purchase Price (as defined in Section 2.1.1).

6.1.2    <u>Machinery and Equipment Production Lease.</u> Buyer shall deliver to Seller the Machinery and Equipment Production Lease (as defined in Section 2.1.2).

6.1.3    <u>Inventory Note.</u> Buyer shall deliver to Seller the Inventory Note (as defined in Section 2.1.4).

6.1.4    <u>Accounts Receivable Note.</u> Buyer shall deliver to Seller the Accounts Receivable Note (as defined in Section 2.1.5).

6.1.5    <u>Real Property Lease.</u> Buyer shall deliver to Landlord, and Landlord shall deliver to Buyer a fully executed Lease for Seller's facilities commonly known as 3217 North Kilpatrick Avenue, Chicago, Illinois in form and substance substantially identical to the unsigned lease attached hereto and incorporated herein as Exhibit "E" hereto.

6.1.6    <u>Instruments of Conveyance and Transfer.</u> A duly executed copy of the Bill of Sale and an Assignment of the Assigned Contracts shall be executed by each of the parties thereto.

6.1.7    <u>Non-Competition Agreements.</u> Duly executed Non-Competition Agreements by and between Walter Levine and Buyer and between David Levine and Buyer, substantially in the form of Exhibits "F" and "G" attached hereto and by this reference incorporated herein shall be executed by each of the parties thereto.

6.1.8    <u>Guaranty.</u> Messrs. Walter Levine and David Levine shall deliver to Buyer the guaranty (as defined in Section 7.6).

6.1.9    <u>Employment Agreement.</u> Buyer shall have delivered to Walter Levine and Walter Levine shall have delivered to Buyer, a fully executed counterpart of an Employment Agreement, in form and substance identical to the unsigned copy attached hereto and incorporated herein as Exhibit "I".

6.1.10    <u>Modified Loan Documents.</u> Seller and/or Seller's principal shall have delivered to Buyer such modifications to the Banco Popular Loans and Line of Credit as Buyer shall require, in its sole discretion, to consummate the transactions contemplated hereto or

CONFIDENTIAL

MEDCP00144

Seller shall have refinanced, paid and settled the Banco Popular Loans and Line of Credit with other or new financing acceptable to Buyer in its sole and absolute discretion.

6.1.11 **Bulk Sales Act Certificate.** Seller shall have delivered to Buyer either (a) a certificate from the Revenue Department that the transactions contemplated by this Agreement are not subject to and does not subject Buyer to any liability under the Bulk Sales Acts or (b) an indemnity from Seller in favor of Buyer indemnifying Buyer from any liability under the Bulk Sales Acts.

6.1.12 **Other Documents.** Seller and Buyer shall each have delivered to the other those closing documents not described elsewhere herein, as set forth in the Index of Closing Documents prepared by Buyer, as well as such other documents as may reasonably be requested by either party.

## ARTICLE 7
## INDEMNIFICATION

7.1 **Obligations of Seller.** Seller agrees to indemnify and hold harmless Buyer and its directors, officers, employees, affiliates, agents and assigns from and against any and all loss, claim, action, cost, damage, assessment, disbursement, expense (including, without limitation, interest, penalties and reasonable attorneys' fees (including reasonable in-house counsel fees)), liability, deficiency, diminution in value, obligation, penalty, judgment or settlement (excluding direct or indirect internal overhead expenses (except reasonable in-house counsel fees)) of any kind or nature (collectively "Losses"), directly or indirectly, as a result of, or based upon or arising from:

7.1.1 Any breach of any representation, warranty or covenant of Seller made in this Agreement; or

7.1.2 Any and all Liabilities including, but not limited to, the following:

(a) Any and all Product Liability Claims (as defined below) asserted against Buyer with respect to finished products manufactured by Seller on or prior to the date hereof (excluding any work-in-process products finished by Buyer after the date hereof). "Product Liability Claims" as used herein shall mean any claim, action, lawsuit or proceeding in which damages are sought for bodily injury or death to any person, or for injury to or destruction of property (other than injury or destruction of the product itself or any parts or components thereof), allegedly arising out of or resulting from any defect in design or manufacture of, or any breach of express or implied warranties or representations made with respect to, any product (or any parts or components thereof) physically manufactured by Seller on or before the date hereof, or in the case of products actually shipped by Seller on or prior to the date hereof, any alleged failure to provide adequate warning or instruction on the use of the products;

(b) Any and all Product Warranty and Return Claims asserted against Buyer. "Product Warranty and Return Claims" as used herein shall mean any claim, action, lawsuit or proceeding in which repaired or replacement products, refunds, or Losses resulting from such products (which are not otherwise included in the Product Liability Claims as set forth above), are sought for any products which are returned pursuant to any previous return policy or related agreement of Seller or which are alleged to be defective, substandard, faulty, inferior or inoperative, or for any injury to or destruction of the product itself or any parts or components

18

CONFIDENTIAL

thereof, or for any breach of express or implied warranties or representations made with respect to, any product (or any parts or components thereof) manufactured, shipped, sold, installed, delivered, serviced or repaired in connection with the Business;

(c) The alleged or actual violation of any law, rule or regulation, prior to the date hereof, by Seller including, without limitation, any Environmental Law or FDA regulation;

(d) The generation, use, transportation, treatment, storage, release or disposal, before the date hereof, of any Hazardous Substance at any property or facility of Seller, or the disposal of any Hazardous Substance by Seller at any Off-Site Facility;

(e) The presence of any Hazardous Substance or the existence of any Environmental Condition at any property or facility of Seller which was present or existed at such property or facility at any time on or prior to the date hereof;

(f) Actions taken by Buyer to bring Buyer or the Real Property into compliance with any applicable law, rule or regulation, including, without limitation, any Environmental Law, as in effect as of the date hereof, any violation or noncompliance existing as of the date hereof;

(g) All claims, liabilities, or obligations, known or unknown arising out of the employment relationship existing at any time between Seller and any and all current or former employees of Seller, including, but not limited to (i) liabilities in any way related such employee's termination pursuant hereto or otherwise; (ii) work-related accidents or injuries, age and sex discrimination, sexual harassment, violation of employment or safety laws and wrongful discharge where the act, omission, event, or occurrence giving rise to the claim, obligation or liability shall have taken place on or prior to the date hereof; (iii) medical or health care claims, obligations and liabilities, under any plan, policy or program of Seller or applicable law; or (iv) violations or failure to comply with the WARN Act; or

7.1.3 All Losses resulting from the assertion of any conflict with or infringement of (or alleged conflict with or infringement of) the rights of any person or entity with respect to the ownership, manufacturing process, design, sale or otherwise of any of the products of the business or the use of the related technology, including, without limitation, patent infringement claims or alleged patent infringement claims; or

7.1.4 All Losses resulting from the assertion of claims made against the Assets sold hereunder or against Buyer by creditors of Seller under any applicable bulk transfer law, including, but not limited to, the bulk transfer provisions of the Uniform Commercial Code of any state, or any similar statute, with respect to the transactions contemplated hereby.

7.1.5 All debts and obligations set forth in Schedule 3.9.2 of the Disclosure Schedule, shall be resolved by Seller and scheduled for payment in such manner as will, in all events, protect and indemnify Buyer from claims therefor. In connection therewith, Seller hereby appoints Buyer as Seller's agent and attorney in fact, which agency is coupled with an interest and shall be irrevocable, to remit to Seller's creditors such sums as may otherwise be payable to Seller for collected accounts receivable, inventory, Real Estate lease payments, or machinery and equipment production lease payments, until such time as all of such debts and obligations are fully compromised and/or paid and adequate

19

CONFIDENTIAL

MEDCP00146

verification of such satisfaction, compromise and/or payment has been furnished to Buyer.

7.2 **Obligations of Buyer**. Buyer agrees to indemnify and hold harmless Seller and its directors, officers, employees, affiliates, agents and assigns from and against any and all Losses, directly or indirectly, as a result of, or based upon or arising from (i) any breach of any representation, warranty or covenant of Buyer made in this Agreement or (ii) the ownership or operation of the Business or the Assets after the date hereof.

7.3 **Procedure**.

7.3.1 In the event that Buyer or Seller (the "Indemnified Party") shall seek indemnification hereunder, it shall give at its first reasonable opportunity to the party obligated to provide indemnification to such Indemnified Party (the "Indemnitor") written notice (a "Claim Notice") describing in reasonable detail the facts giving rise to any claim for indemnification hereunder including the basis of such claim in general terms (including a specific reference to the provision of the Purchase Agreement under which such claim arises), the date such Claim Notice is being sent, and (if then known) the amount or the method of computation of the amount of such claim and (if not then known) the Indemnified Party's reasonable estimate of the anticipated maximum amount of such claim together with the basis of such estimate; provided, that a Claim Notice in respect of any action at law or suit in equity by or against a third person as to which indemnification will be sought shall be given promptly after the action or suit is commenced. Neither the failure of the Indemnified Party to give notice hereunder, or defects or errors in any notice given, shall relieve the Indemnitor of any indemnity obligation pursuant to this Agreement. However, to the extent that such failure, defect or error actually prejudices the rights of the Indemnitor, the Indemnified party's rights hereunder may be limited to the extent of such actual prejudice.

7.3.2 After the giving of a Claim Notice pursuant hereto, the amount of indemnification to which an Indemnified Party shall be entitled shall be determined (i) by the written agreement between the Indemnified Party and the Indemnitor; (ii) by a judgment or decree of any court of competent jurisdiction; or (iii) by any other means to which the Indemnified party and the Indemnitor shall agree.

7.3.3 The Indemnitor shall have the right to conduct and control, through counsel of its choosing reasonably acceptable to the Indemnified Party, the defense, compromise or settlement of any third person claim, action or suit against such Indemnified Party as to which indemnification is sought by any Indemnified Party from any Indemnitor hereunder, provided that the Indemnitor (i) has acknowledged and agreed in writing, within 14 days after the giving of a Claim Notice or such shorter period as may be required to avoid any prejudice to the right of the Indemnified Party, that, if the same is adversely determined, the Indemnitor has an obligation to provide indemnification to the Indemnified Party in respect thereof and (ii) diligently and timely defends against such claim, action or suit. In any such case the Indemnified Party shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trial and appeals as may be reasonably requested by the Indemnitor in connection therewith; provided, that the Indemnitor shall not, without the written consent of the Indemnified Party (which consent shall not be withheld unreasonably) compromise or settle any such claim, action or suit. The Indemnified Party shall have the right to employ separate counsel in any claim, action or suit and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of the Indemnified Party unless (i) the Indemnitor has

20

MEDCP00147

agreed in writing to pay such fees and expenses; (ii) the Indemnitor has failed to assume the defense and employ counsel; or (iii) the named parties to any such claim, action or suit (including any impleaded parties) include both the Indemnitor and the Indemnified Party and the Indemnified Party shall have been advised by its counsel that representation of the Indemnitor and the Indemnified Party by the same counsel would be inappropriate under applicable standards of professional conduct (whether or not such representation by the same counsel has been proposed) due to actual or potential differing interests between them (in which case the Indemnitor shall not have the right to assume the defense of such claim, action or suit on behalf of the Indemnified Party).

7.4 **Payment.** As to any matter for which Buyer may be able to assert a claim hereunder in accordance with this agreement, Buyer shall have the right, in addition to any other rights and remedies (whether under this Agreement, or otherwise), to withhold and offset any payment due to Seller under this Agreement, the Production Lease, the Inventory Note, Accounts Receivable Note (but not the Real Estate Lease), as determined in the sole and absolute discretion of Buyer. Once a final resolution to such claim by Buyer has been reached (i) any remaining liability in excess of the total of such Payments shall be promptly paid by Seller to Buyer, by wire transfer of immediately available funds to an account designated by Buyer, or (ii) any remaining amount due under any of the foregoing obligations of Buyer shall be paid by Buyer to Seller in accordance with the terms and provision of Section 2.1, without interest.

7.5 **Term.** This Article 7 shall survive the date hereof and shall remain in effect as follows: (i) as to any indemnification obligation arising pursuant to Sections 7.1.1 and 7.1.3, this Article 7 shall survive the date hereof and shall remain in effect for a period of five (5) years after the date hereof or such lesser period as may be provided in Section 8.13 in respect of the particular representation or warranty alleged to have been breached and (ii) as to any indemnification obligation arising pursuant to Sections 7.1.4 and 7.1.5, this Article 7 shall remain in effect indefinitely; provided, however, that as to any matter for which a claim has been asserted in accordance with the provisions of this Agreement that is pending or unresolved at the end of any limitation period set forth in this Section, this Article 7 shall remain in effect until such matter is finally terminated or otherwise resolved by the parties and settled under this Agreement or by a court of competent jurisdiction and any amounts payable hereunder are finally determined and paid.

7.6 **Guaranty of Obligations.** All representations, warranties and covenants of Seller under this Agreement and of the Landlord under the Real Property Lease are guaranteed by Walter Levine and David Levine pursuant to a Guaranty, substantially identical in form and substance to Exhibit "H" attached hereto (the "Guaranty") executed by Walter Levine and David Levine in favor of Buyer.

**ARTICLE 8**
**GENERAL**

8.1 **Amendments; Waiver.** This Agreement and any schedule or exhibit attached hereto may be amended only by an agreement in writing of all parties. No waiver of any provision nor consent to any exception to the terms of this Agreement shall be effective unless in writing and signed by the party to be bound and then only to the specific purpose, extent and instance so provided.

8.2 **Schedules; Exhibits; Integration.** Each schedule, including the Disclosure Schedule, and exhibit delivered pursuant to the terms of this Agreement shall be in writing and shall constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement. This Agreement, together with such schedules and exhibits, are integrated as one agreement, constitute the entire Agreement among the parties pertaining to the subject matter hereof and

21

CONFIDENTIAL

MEDCP00148

thereof and supersede all prior agreements and understandings of the parties in connection therewith.

8.3    **Best Efforts; Further Assurances.** Each party will use its best efforts to cause all conditions to its and the other parties' obligations hereunder to be timely satisfied and to perform and fulfill all obligations on its part to be performed and fulfilled under this Agreement, to the end that the transactions contemplated by this Agreement shall be effected substantially in accordance with its terms. Each party shall execute and deliver such further certificates, agreements and other documents and take such other actions as may be necessary or appropriate to consummate or implement the transactions contemplated hereby or to evidence such events or matters.

8.4    **Governing Law.** This Agreement, and the legal relations between the parties, shall be governed by and construed in accordance with the laws of the state of Ohio, without regard to conflicts of law doctrines. All actions or proceedings under or relating to this Agreement will be resolved in a state or federal court located in Franklin County, Ohio; provided, however, that in the Buyer's discretion, such an action may be heard in some other place designated by it if necessary to acquire jurisdiction over third persons so that the dispute can be resolved in one action. Each party hereby (i) agrees to submit to the jurisdiction of the federal and state courts located in Franklin County, Ohio; (ii) agrees to appear in any such action; (iii) consents to the jurisdiction of such courts; and (iv) waives any objections it might have as to venue in any such court. Service of process may be made in any action, suit or proceeding by mailing or delivering a copy of such process to a party at its address and in the manner set forth in the Notice Section contained herein.

8.5    **No Assignment.** Neither this Agreement nor any rights or obligations under it are assignable without the prior written consent of the other party.

8.6    **Headings.** The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

8.7    **Counterparts.** This Agreement and any amendment hereto or any other agreement (or document) delivered pursuant hereto may be executed in one or more counterparts and by different parties in separate counterparts. All of such counterparts shall constitute one and the same agreement (or other document) and shall become effective (unless otherwise provided therein) when one or more counterparts have been signed by each party and delivered to the other party.

8.8    **Publicity and Reports.** Buyer shall coordinate all publicity relating to the transactions contemplated by this Agreement and only Buyer shall issue any press release, publicity statement or other public notice relating to this Agreement, or the transactions contemplated by this Agreement, except to the extent that a particular action is required by applicable law. Seller shall obtain the prior written consent of Buyer in the case of any form and the contents of any application or report made to any governmental entity or which relates to this Agreement, which consent shall not be unreasonably withheld.

8.9    **Remedies Cumulative.** All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available. In addition, Article 7 shall not be deemed to preclude or otherwise limit in any way the exercise of any other rights or pursuit of other remedies for the breach of this Agreement or with respect to any misrepresentation.

8.10   **Parties in Interest.** This Agreement shall be binding upon and inure to the benefit of each party, and nothing in this Agreement, express or implied, is intended to confer upon any other person any rights or remedies of any nature whatsoever under or by reason of this Agreement. Nothing

22

CONFIDENTIAL

MEDCP00149

in this Agreement is intended to relieve or discharge the obligation of any third person to any party to this Agreement.

8.11   **Notices.**  Any notice or other communication hereunder must be given in writing and (a) delivered in person; (b) transmitted by telex, telefax or telecommunications mechanism; (c) sent by reputable overnight courier; or (d) mailed by certified or registered mail, postage prepaid, return receipt requested as follows:

**If to Buyer:**

Medex Cardio-Pulmonary, Inc.
6250 Shier Rings Road
Dublin, Ohio 43016
Facsimile: 614-791-5464
Attn: President

**With a copy to:**

Medex, Inc.
6250 Shier Rings Road
Dublin, Ohio 43016
Facsimile: 614-791-5464
Attn: General Counsel

**If to Seller:**

Inhalation Plastics, Inc.
c/o Walter Levine
6528 NORTH KOKOMIS
LINCOLNWOOD ILLINOIS 60712
Facsimile: _____

**With a copy to:**

ROBERT T. STEELE
MALTER, PANTER & STEELE
1515 E. WOODFIELD ROAD, 2ND FLOOR
Facsimile: SCHAUMBURG, IL 60173
(847) 330-1231

or to such other address or to such other person as either party shall have 1st designated by such notice to the other party.  Each such notice or other communication shall be effective (i) if given by telecommunication, when transmitted to the applicable number so specified in (or pursuant to) this Section and an appropriate answer back is received; (ii) if given by mail, three (3) days after such communication is deposited in the mail with first class postage prepaid, addressed as aforesaid; or (iii) if given by any other means, when actually received at such address.

8.12   **Expenses and Attorneys Fees.**  Seller and Buyer shall each pay their own expenses incident to the negotiation, preparation and performance of this Agreement and the transactions contemplated herein, including but not limited to the fees, expenses and disbursements of their respective accountants and counsel.  In the event of any action for the breach of this Agreement

23

MEDCP00150

or misrepresentation by any party, the prevailing party shall be entitled to reasonable attorneys' fees, costs and expenses incurred in such action.

8.13 **Survival.** All representations and warranties of the parties contained in this Agreement shall survive the execution and delivery of this Agreement for three (3) years after the date hereof; provided, however, the representations and warranties set forth in Section 3.8 and 3.20 shall survive until one (1) year after the expiration of the applicable statutes of limitations.

8.14 **Specific Performance.** Seller and Buyer each acknowledge that, in view of the uniqueness of the Business and the transactions contemplated by this Agreement, each party would not have an adequate remedy at law for money damages in the event that this Agreement has not been performed in accordance with its terms, and therefore agrees that the other party shall be entitled to specific enforcement of the terms hereof in addition to any other remedy to which it may be entitled, at law or in equity.

8.15 **Severability.** If any provision of this Agreement is held to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, to achieve the intent of the parties to the extent possible. In any event, all other provisions of this Agreement shall be deemed valid and enforceable to the extent possible.

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Agreement to be executed by its duly authorized officers as of the day and year first above written.

SELLER:

INHALATION PLASTICS, INC.,
an Illinois corporation

By: _____
Name: _WALTER LEVIN_
Title: _PRESIDENT_

BUYER:

MEDEX CARDIO-PULMINARY, INC.,
an Ohio corporation

By: _____
Name: _Damian A Aman_
Title: _President_

24

TOTAL P.25

CONFIDENTIAL

MEDCP00151